[No. H022088. Sixth Dist. Dec. 31, 2002.]

DE ANZA ENTERPRISES et al., Plaintiffs and Appellants, v.
JOSEPH C. JOHNSON et al., Defendants and Respondents.

**COUNSEL**

Dennis William Smith for Plaintiffs and Appellants.

Olimpia, Whelan, Lively & Ryan, David W. Lively and Adam R. Bernstein for Defendants and Respondents.

## OPINION

ELIA, J.—After three and a half years of litigation, the trial court ordered specific performance of a term in a joint venture agreement allowing plaintiff Wade Hover to purchase the interest of defendant Joseph C. Johnson in the property owned by them as part of their joint venture, De Anza Enterprises. On appeal, Hover disputes the purchase price of Johnson's interest, contending that the appraised value of the property should have been determined as of the date Johnson defaulted on his contractual obligation, the date Hover declared an intention to buy out Johnson, or at the latest, the date Hover brought this lawsuit. Hover further argues that the court failed to credit him with rent received by Johnson before and after the effective date of the transfer. We find no error and affirm the judgment.

### Background

Although we have reviewed the entire record of the lengthy proceedings below, we will set forth only those facts necessary to the resolution of this appeal. Because plaintiff does not challenge the sufficiency of the evidence supporting the trial court's factual findings, we adopt those findings in describing the context of the dispute before us.

Hover and Johnson organized De Anza Enterprises in 1977 to invest in an office building and warehouse located in Cupertino. Hover, who had served as Johnson's attorney and property manager in the past, was to manage the financial and legal affairs of the property. They first operated the enterprise under an oral agreement, but in 1984 they reduced the arrangement to a writing.

The document at issue is entitled "Joint Venture Agreement" (Agreement), which the parties executed on March 13, 1991. This Agreement, which superseded the 1984 document,[1] defined the relationship between Hover and Johnson, allowing Hover to manage the interest of the parties in the rental property.[2]

The Agreement contained specific provisions in the event of a "default" by either party. Article 7 listed six kinds of events that would constitute default, and it described the procedure that would enable the nondefaulting party to buy out the defaulting party.

---

[1] The parties became embroiled in litigation over the 1984 agreement. Eventually they settled their dispute and the action was dismissed.

[2] Johnson was to hold one half-interest in the property, and a Hover family trust was to hold the other half.

In February 1994 Hover learned that in 1990 Johnson had "surreptitiously" obtained a loan secured by a deed of trust on his interest in the property and an assignment of rents. Johnson's lender refused to subordinate its deed of trust, causing a priority dispute involving Johnson's lender and that of the joint venture.

In March 1994 Hover wrote to Johnson, accusing him of conduct that constituted a default under article 7 of the Agreement. In April 1994, responding to another letter from Hover, Johnson asked Hover whether he wanted to buy out Johnson's half-interest. If Hover agreed, Johnson noted, an appraisal would be needed. Hover, however, was not ready to make such a decision.

On August 2, 1995, following the initiation of litigation by the joint venture's lender, Hover wrote to Johnson suggesting a termination of the joint venture through his purchase of Johnson's interest. He asked Johnson to "advise whether you would be interested in selling and by what process, i.e. joint appraisers?" Johnson did not respond.

On November 20, 1995, Hover notified Johnson that he was declaring a default under article 7 of the Agreement, and that he was appointing an arbitrator. On December 5, 1995, Hover sent Johnson another letter listing Johnson's defaults and concluding, "Wherefore, as provided in article 7.2, I have declared the said defaults and declare my election to purchase your interest in the joint venture. The provisions of the agreement provide for appraisal of your interest, subject to the outstanding debt you have created or are chargeable with." Later that month Hover declared an additional default after Johnson told the tenant that Hover no longer represented him in future rental negotiations. In January 1996 Hover suggested that they terminate their relationship as soon as possible, and he again urged Johnson to sell him Johnson's half-interest "at the price established by appraisal," in "the fashion specified in the joint venture agreement." Johnson responded with his own offer to buy Hover's interest, but Hover declined.

Ten months later, after an arbitrator's resolution of a dispute over Hover's management fees, Hover again wrote Johnson about terminating their relationship. Hover asked for Johnson's cooperation in Hover's purchase of Johnson's interest. Hover suggested that they needed an appraisal "by a neutral appraiser," and he requested a response within 30 days.

Johnson replied through counsel, denying any default. On December 2, 1996, however, Johnson wrote to Hover to terminate the joint venture.[3]

*The Lawsuit*

Hover filed suit against Johnson on December 20, 1996, seeking declaratory relief, specific performance, and damages for breach of contract and interference with prospective economic advantage. Hover alleged not only the defaults of Johnson, but also Johnson's denial of the defaults, his refusal "to negotiate the terms" of Hover's purchase of his interest, and his refusal "to appoint any appraisers." In the cause of action for specific performance, Hover requested "[a]n order decreeing the purchase option has been exercised and compelling defendants to appoint appraisers" and "[a]n order decreeing the sale at the appraised price and providing time to finance said purchase."

Hover thereafter amended his complaint three times. The final version, the third amended complaint, was filed on the third day of trial, November 24, 1998. In that pleading he requested a declaration of Johnson's default and of his own right to purchase Johnson's interest. More specifically, the third amended complaint asserted that Hover had "exercised properly the option to purchase JOHNSON'S interest" and that he was entitled to purchase that interest "at its fair market value on December 5, 1995." Hover further alleged that he had "exhausted his remedies provided for in the contract by giving notice of election to purchase JOHNSON'S interest and demanding that JOHNSON appoint an appraiser and conduct the necessary proceedings to conclude the buyout. JOHNSON has refused." Finally, he asserted entitlement to a court-ordered sale of Johnson's interest in the joint venture under former Corporations Code section 15038.

*The Valuation Dispute*

During the court trial Hover disputed the relevancy of evidence of the *current* value of the property. He urged the court to construe the agreement to provide for valuation as of "the date of election to buy out" the defaulting party. Hover pointed to section 7.3 of the Agreement, which set forth the procedure for selecting appraisers in the event of such an election. In his view, the date he elected to buy out Johnson (i.e., Dec. 5, 1995) should be the date of valuation, and the property's current value was irrelevant as a matter of law. Alternatively, he characterized the termination of the parties' relationship as a "voluntary dissolution" effected by Johnson's December 2, 1996 letter terminating the joint venture. Citing former Corporations Code

---

[3]The Agreement allowed either party to withdraw at will from the joint venture.

section 15038, Hover thus argued that the property must be valued as of that "dissolution" date.

*The Trial Court's Decision*

The court first explained its decision to grant specific performance, finding two default events that had triggered the "buy-out option" of the March 1991 Agreement. First, Johnson had breached section 6.3(f), by obtaining a loan secured by his interest in the property, thereby impairing Hover's buy-out rights and risking the loss of the joint venture. The concealment of the loan was itself a breach of section 5.1 of the Agreement as well as a breach of the covenant of good faith and fair dealing. Johnson then did not help rectify the resulting "serious priority problem" between creditors, nor did he offer to account to the joint venture for the concealed loan. Johnson had also breached section 7.1(f) by creating a risk of loss to the joint venture when he was sued by the joint venture's lender in July 1995.

The court thus specifically found that Hover had established his entitlement to specific performance of the provision allowing a nondefaulting party to purchase the defaulting party's interest. The court rejected Hover's request for a remedy under former Corporations Code section 15038, since 1) Hover had "made it very clear" that he was not seeking damages for breach of contract; 2) the parties had agreed that the joint venture had already been dissolved in December 1996; and 3) the statute did not authorize such a court-ordered sale, "much less at a price fixed by a pre-judgment date of dissolution [either date of breach or date of buy-out election]." The court further declined to apply equitable principles to impose a court-ordered sale.

As to the valuation of Johnson's interest, the trial court noted that the Agreement had not specified a date by which the valuation was to be measured. The court rejected Hover's request to fix the purchase price as of December 5, 1995, the date of his declaration of default and election to purchase. In the court's view, the parties' agreement did not indicate any intent to specify a valuation date, "much less fix the date as of a noticed default/election to sell, and the Addendum Agreement cannot reasonably be so interpreted."

The court concluded that the agreement was "clear on fixing the purchase price by mutual agreement (Section 7.3) or by appraisal (Section 7.3 last paragraph), leaving the date of such fixing to follow as a matter of course" after the selection of appraisers. "The 'course' that the parties have taken in this regard carries them right through trial. In specifically enforcing their contract, the court will pick up where they [left] off, i.e., without mutual

agreement and without selection of appraisers under Section 7.3a, and proceed to order selection of appraisers pursuant to Section 7.3 a and b. The date of determination of fair market value shall occur as the natural consequence of the appraisers' compliance with these contract provisions, starting with the 15[-]day period specified for each party to select his appraiser to commence upon entry of the Interlocutory Judgment herein."

The court explained that its conclusion was consistent with the apparent intent of the parties to have the property "valued by the appraisers in the normal course of the appraisal process, which process neither party has yet triggered. The court does not propose to override this intent by selecting a value date not provided for in the Agreement."

The interlocutory judgment accordingly ordered the parties to select appraisers pursuant to section 7.3 of the Agreement, and it stated that the property would be valued "as the natural consequence of the appraiser[s'] compliance with the contract provision[s]." Thus, the purchase price was to be one-half of the fair market value of the entire joint venture property, less Johnson's share of the debts to the lenders, to plaintiff, and to other creditors. The court thereafter appointed a special master to wind up the affairs of the joint venture and report to the court for purposes of resolving Hover's third cause of action for an accounting. After receiving that report, the court entered its final judgment, specifying a purchase price of $3,303,500, less amounts for Hover's appraisal costs, rents received by Johnson since December 28, 1999,[4] and other expenses. Hover thus obtained a judgment for $40,141.96 plus prejudgment interest and costs of suit. His motion for a new trial was denied.

## Discussion

### 1. Scope and Standard of Review

The primary issue before us is whether the trial court erred in setting the date of valuation to correspond to the time of appraisal—i.e., to follow the buy-out election and appointment of appraisers "as a matter of course." At the outset, the parties debate the appropriate standard of review of this ruling. Hover argues that interpreting the terms of a written contract "normally presents a question of law," which the appellate court examines independently of the trial court. Johnson maintains that the substantial evidence rule applies, because the court's ruling was based on factual findings regarding Hover's failure to follow the appraisal process.

---

[4]December 28, 1999, was the date the appraisal was completed. The court deemed this to be the date of transfer of Johnson's interest to Hover.

Hover's argument more closely identifies our role on appeal. Johnson offers a long list of findings he believes we should uphold as supported by substantial evidence, but most of them are legal conclusions or resolutions of mixed questions of fact and law. ■ The issue before the court was fundamentally one of contractual interpretation, because the trial court, in order to apply specific performance, had to determine the parties' intent with regard to the buy-out procedure. (Civ. Code, § 1636.) In undertaking this function, a court generally looks to "objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. (Civ. Code, §§ 1635-1656; Code Civ. Proc., §§ 1859-1861 . . . .)" (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912 [75 Cal.Rptr.2d 573].) "Contract law being a question of objective manifestation of intent, the courts should treat a document as what it says it is unless extrinsic evidence supplies notice of ambiguities . . . ." (*Roth v. Malson* (1998) 67 Cal.App.4th 552, 558 [79 Cal.Rptr.2d 226].)

■ When a trial court's construction of a written agreement is challenged on appeal, the scope and standard of review depend on whether the trial judge admitted *conflicting* extrinsic evidence to resolve any ambiguity or uncertainty in the contract. If extrinsic evidence was admitted, and *if* that evidence was in conflict, then we apply the substantial evidence rule to the factual findings made by the trial court. But if no extrinsic evidence was admitted, or if, as here, the evidence was not in conflict, we independently construe the writing. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165-1166 [6 Cal.Rptr.2d 554]; *Morey v. Vannucci, supra,* 64 Cal.App.4th at pp. 912-913; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].)

A different standard is applied to equitable rulings, such as the trial court's rejection of Hover's request to "adjust the equities" to compensate him from "the contract date of performance" and its refusal to assign a dissolution date before Johnson's termination for purposes of the property valuation. Such rulings were matters for the exercise of the trial court's sound discretion, which we will not overturn absent a showing of abuse. (*Parage v. Couedel* (1997) 60 Cal.App.4th 1037, 1041 [70 Cal.Rptr.2d 671]; *Plut v. Fireman's Fund Ins. Co.* (2000) 85 Cal.App.4th 98, 103 [102 Cal.Rptr.2d 36].)

2. *Construction of the Agreement*

Hover contends that the language of the parties' contract, read as a whole, "clearly indicates that the parties intended an expeditious determination of

fair market value, contemporaneous with the default declaration and exercise of the [purchase] option." We agree with the first part of this statement. Article 7 provides three options under which a nondefaulting joint venturer may act upon the default of the other. Hover chose "Option 1," the purchase of Johnson's interest. The election of that option was to be made "at any time of the date of default, upon [ten] 10 days written notice of such election to the defaulting Joint Venturer provided that default is continuing on the date notice is given."[5] Section 7.3 then describes the procedure for ascertaining the purchase price. It anticipates a determination through either negotiation or appraisal: "The purchase price for the defaulting Joint Venturer's interest shall be paid upon terms agreeable between the defaulting and nondefaulting Joint Venturer. . . . [¶] The purchase price shall be as agreed upon or as determined by appraisal as set forth below . . . ."

The appraisal procedure is described as follows: "Selection of Appraisers [¶] a. Within fifteen (15) days after an appraisal is required under any provisions of this Agreement, each Joint Venturer shall select an appraiser. If any Joint Venturer fails to name an appraiser within the specified time, the other Joint Venturer may select an additional appraiser. [¶] Determination of Fair Market Value [¶] b. The appraisers selected under paragraph 7, [sic] shall determine the fair market value of the Joint Venture property as a whole unit. They shall take into account any defaulting or withdrawing Joint Venturer's interest and equity in the Joint Venture as well as any outstanding obligations or encumbrances relating to Joint Venture property. The appraiser's [sic] determination of fair market value shall be final and binding on all parties. [¶] If an even number of appraisers have been selected and are unable to agree on fair market value, they shall select an additional appraiser whose determination of fair market value shall be averaged with those of the other appraisers. The average shall be conclusive as to the joint venture fair market value and shall be final and binding on all parties." ▉ Thus, the provision of 15 days in which to designate an appraiser does indicate that the parties intended an "expeditious" appraisal whenever appraisal was called for by the parties' failure to agree on a purchase price. Nothing in article 7, however, requires a valuation to be retroactive. If anything, the short selection period supports the inference that the parties expected an appraisal to occur within a short time after a purchase election. If a selection and ensuing appraisal were promptly made under this provision, there would generally be no need to assign a fair market value to a specific date.

---

[5] The phrase "at any time of the date of default" is the result of a change from an earlier draft, which had provided for the election to be made "at any time within three (3) months of the date of default . . . ." The three-month period was struck from the language of the final agreement, leaving a nonsensical phrase. As Hover testified, however, it is apparent that "what was intended was that the . . . election could be made at any time *after* the date of default." (Italics added.)

In this case, however, the process did not occur as contemplated by the contracting parties. Hover sent Johnson one notice of default as early November 20, 1995, another on December 5, 1995, and another on December 18, 1995. On January 4, 1996, asserting a "serious breach" of the Agreement, Hover stated, "I believe you should now agree to sell your interest by a sale in the fashion specified in the joint venture agreement. . . . You can't lose by selling your one half at the price established by appraisal." When Johnson responded with an offer to purchase Hover's interest instead, Hover declined in a cursory reply. Hover took no further action to accomplish the purchase of Johnson's interest under article 7. On November 7, 1996, he informed Johnson, "I am interested in obtaining your cooperation in the completion of my election to purchase your interest in the De Anza building." Hover urged Johnson to avoid further litigation by agreeing to the sale. Invoking section 7.3 of the Agreement, he stated, "What we need to do is have an appraisal made by a neutral appraiser and to conclude the sale in escrow. I will expect to hear from you within 30 days regarding whether you will agree to process this purchase/sale or insist on a court action."

Unquestionably, Hover sought Johnson's cooperation in achieving the sale. Just as clearly, Johnson was not interested in selling his interest in the property. Johnson denied being in default as late as November 26, 1996, in a letter written by his attorney. But Johnson's cooperation was not a condition precedent to execution of the appraisal. Both parties were required to select an appraiser within 15 days "after an appraisal is required," and neither performed. Furthermore, Johnson's failure to select an appraiser entitled Hover under section 7.3a to appoint *both* his own and a second appraiser, but he did not avail himself of that opportunity. Thus, the "expeditious" determination of fair market value could not occur because of *both* parties' failure to proceed as contemplated in the Agreement.

Hover maintains that "[i]t is the exercise of the option that sets the date for valuing the property. Otherwise, the buyer would be left the impossible task of securing agreement on a valuation date from someone whose breaches have caused the exercise of the purchase option." This assertion makes a reasonable point, and thus has a superficial appeal. But the Agreement obviates this "impossible task" by allowing the valuation to take place without the cooperation of the defaulting party. Had Hover proceeded with the selection of his own appraiser and an additional one for Johnson, the appraisal would have followed in due course. There appears to be nothing in the Agreement or the evidence supplied by the parties that suggests this was not the course intended by them when they signed this document. By delaying the implementation of the appraisal procedure, both parties took the

risk that the property would change in value by the time the appraisal finally took place.[6]

Thus, examination of the contract terms, in the context of the document as a whole and the surrounding circumstances, leads to the conclusion reached by the trial court, that the parties intended to fix the purchase price by mutual agreement or appraisal, "leaving the date of such fixing to follow as a matter of course."

Hover further contends that "[t]he contractual right to an appraisal procedure . . . can be waived." This assertion is not accompanied by a description of the conduct Hover believes constituted an "implied" waiver. He devotes more attention to his next argument, that Johnson repudiated the Agreement on November 26, 1996, when he denied being in default. In Hover's view, once Johnson denied that Hover had a right to purchase and "refused to appoint appraisers," Hover was "entitled to pursue his legal remedies without further contract performance then or later."

This argument must be rejected. Hover neither pleaded anticipatory breach nor proved it at trial. By failing to raise this theory until he presented his objections to the court's intended decision, Hover could point to no evidence that Johnson expressed a "clear, positive, unequivocal refusal to perform" a material promise before that performance was due. (See *Taylor v. Johnston* (1975) 15 Cal.3d 130, 137 [123 Cal.Rptr. 641, 539 P.2d 425].) Neither Johnson's denial that he was in default nor his failure to appoint an appraiser within 15 days constituted an anticipatory breach: the former was a dispute over past performance, while the latter was a nonperformance of a current obligation. Hover's repudiation theory is inapplicable in these circumstances and was properly rejected by the trial court.[7]

Hover offers a number of dates by which the fair market value of the property could have been measured: March 13, 1991, when Johnson signed the contract, because he was already in breach at that time; December 5, 1995, when Hover first announced his intention to purchase Johnson's interest; December 2, 1996, when Johnson terminated the Agreement; and at the latest, December 20, 1996, when he filed suit against Johnson. Each of

---

[6]Hover admitted at trial that he was aware of his buy-out right when he signed the Agreement in March 1991. He explained that he did not initiate the appraisal process in 1994 because of the "quite depressed" condition of the market in the area, the uncertain availability and interest rates of loans, and his desire that Johnson cure the default by eliminating or subordinating his loan. By December 1995, however, market trends had "[v]ery little" effect on his decision to buy out Johnson.

[7]Contrary to Hover's representation, the trial court did not rule that Johnson's "secret loan" constituted a "total *anticipatory* breach as of March 13, 1991."

these suggestions overlooks the distinction between the right to purchase and the specific appraisal process to which the parties had agreed. If Hover has correctly presented the question—i.e., "when was JOHNSON legally obligated to sell his interest to HOVER?"—the answer does not inform the determination of the date on which the fair market value must be measured. Hover cites no authority that would override the contract by inserting a term equating the *obligation* to sell with the valuation date.

## 3. *Equitable Conversion of Title*

■ Hover further contends that the trial court "denied him the benefits that flow from its findings." Specifically, he argues, the court should have found him to be the equitable owner of the Cupertino property "from the time the property should have been conveyed to him," i.e., no later than the filing of the complaint on December 20, 1996. As a result of the court's "refusal to follow the principle of equitable conversion of title," Hover contends he was deprived of rents and profits that should have been credited against the purchase price of Johnson's interest.[8]

One of the difficulties in evaluating Hover's claim is that in his discussion he advocates relation back alternately to the dates of default, to the "contract date," and to the date of the lawsuit, without distinction. A more fundamental problem is the premise of Hover's argument. The authorities he cites relate to compensation to buyers for delays in performance caused by sellers. As previously discussed, Johnson's inaction was not the only source of the delayed sale. Notwithstanding Hover's portrayal of Johnson as the sole obstacle to the appraisal, the trial court found that *neither* party had followed the appraisal provisions of the Agreement. Hover wisely does not attempt to directly challenge this factual finding.

Hover does suggest that the delay in appointing the appraisers and obtaining an order for the sale was Johnson's fault, because of Johnson's "refusal to mutually [*sic*] agree on fair market valuation, and . . . by his denial of his contract default and his obligation to sell . . . ." The appraisal, however, did not require either agreement or a judicial decree. Hover admitted at trial that when he signed the Agreement he understood that an appraisal was required if he and Johnson could not agree on a buy-out price, and he had understood that he could proceed with the appraisal even if Johnson did not cooperate. He had tried to enlist Johnson's cooperation in achieving the sale, including an appraisal, but he received no response until the letter from Johnson's attorney in December 1996. Had Hover followed the procedure

---

[8]Section 7.3 states that "[w]hile the default exists the defaulting Joint Venturer shall receive no rent or lease payments from the Bank under Article 7.3."

set forth by the contract, the appraisal would have been completed before he was disadvantaged by the inflation of Johnson's interest. Equitable conversion of title has no application in these circumstances.

## 4. *Former Corporations Code Section 15038*

In the fourth cause of action to the third amended complaint, Hover alternatively sought relief under former Corporations Code section 15038 (hereafter section 15038), claiming the right to a court-ordered sale of defendant's "interest in the joint venture." Initially the trial court determined that findings on this claim were unnecessary since it was granting specific performance. In any event, the court noted, Hover's resort to section 15038 was misdirected, as it ignored the terms of the parties' agreement.

Upon Hover's objection, the court addressed the merits. It again observed, however, that it had already determined the right to relief in the form of specific performance of the buy-out option. It noted that, while section 15038 provided for damages against the partner who had wrongfully caused a dissolution, Hover was not seeking damages. The court refused to disregard the Agreement in favor of a court-ordered dissolution, since the joint venture had already been dissolved when Johnson served his at-will termination notice in December 1996. Section 15038 "confers no right against the wrongdoing partner to compel the sale of his partnership interest to the other much less at a price fixed by a pre-judgment date of dissolution as of the date [of] the breach." Alternatively construing Hover's request as a petition for discretionary equitable relief, the court declined to grant that request.

On appeal, Hover maintains that the "statutory scheme" of the Corporations Code "dictates" a valuation of Johnson's property interest as of the date of dissolution. He relies on *Vangel v. Vangel* (1953) 116 Cal.App.2d 615 [254 P.2d 919] in observing that when one partner has caused a partnership dissolution "in contravention of the partnership agreement," the court has the power to deem the dissolution date to be a date earlier than the judgment of dissolution. "In some cases where the breach is serious and unequivocal the dissolution may be decreed as of the date of the breach." (*Id.* at p. 626.) In this case, Hover argues, the court "ignore[d] the statutory scheme" for valuing Johnson's interest as of the date of his voluntary withdrawal, even if it acted within its discretion by choosing not to value Johnson's interest at an earlier date.

The trial court correctly rejected Hover's position. Dissolution of the partnership here was effected by Johnson's notice of termination, not by his prior conduct or by court order. Nothing in the cited Corporations Code

sections mandated a valuation of the Cupertino property as of December 2, 1996, or any earlier date. To the extent that the court was empowered under principles of equity to assign a dissolution date before December 1996 (*Vangel v. Vangel, supra,* 116 Cal.App.2d at p. 626), it properly exercised its discretion not to do so.

### 5. *Purchase Credits for Rent Received*

The court's statement of decision and interlocutory judgment reflect its view that a default that triggers the buy-out option "must create a prejudice or loss that makes [the] withholding of the gross income of the joint venture reasonable compensation." To find otherwise, the court ruled, would be tantamount to a "contract penalty" that would "trigger a forfeiture defense." The court further observed that the concealed loan, with its subordination of the security of the joint venture's lender, had "created a substantial risk of loss to the Joint Venture." However, the court refused to "speculate" on the pecuniary loss Hover would suffer, and relegated any determination of such loss to the upcoming accounting phase.

The special master, the Honorable John A. Flaherty (retired), sought to implement the court's ruling by conscientiously determining whether Hover had suffered "pecuniary losses due to the default events created by [Johnson]." Based on the evidence received in the accounting phase, Judge Flaherty found that Hover's losses were "slight."

Hover maintains that he was entitled to all of the rents and profits received during the time the property "should have been conveyed to him." This argument is again based on the erroneous premise that Johnson was solely at fault for the delay in the appraisal. The authorities Hover cites, pertaining to a seller's failure to convey property at the time performance was due, are plainly inapposite here.

*Ellis v. Mihelis* (1963) 60 Cal.2d 206 [32 Cal.Rptr. 415, 384 P.2d 7], for example, is distinguishable. In explaining the remedy of specific performance, the Supreme Court in *Ellis* noted the equitable rule that the party entitled to the remedy "is also ordinarily entitled to a judgment for the rents and profits from the time he was entitled to a conveyance." (*Id.* at p. 219; see also *Hennefer v. Butcher* (1986) 182 Cal.App.3d 492, 505 [227 Cal.Rptr. 318].) When specific performance is granted, "the decree should as nearly as possible require performance in accordance with its terms. One of the terms is the date fixed by it for completion, and since that date is past, the court, in order to relate the performance back to it, gives the complainant credit for any losses occasioned by the delay and permits the defendant to offset such

amounts as may be appropriate." (*Ellis v. Mihelis, supra,* 60 Cal.2d at p. 220; *Hennefer v. Butcher, supra,* 182 Cal.App.3d at p. 505.)

Here, by contrast, there is no date "fixed by [the contract] for completion." Thus, there is no reference point from which income may properly be attributed to Hover. Hover's reliance on the principles of equity is based on the assumption that Johnson impeded his performance and thereby delayed completion of the sale. The procedural mechanism for the sale, however, called for appraisal. As discussed earlier, it was both parties' responsibility to ensure that the appraisal take place, and it was the lack of appraisal, not Johnson's refusal to sell, that led to the later valuation date. Confusing the sale with the appraisal produces Hover's faulty logic that equity compels a retroactive valuation. Even if we accept his view that the exercise of the purchase option created a new contractual obligation by Johnson to sell, the appraisal provisions were not eliminated from the parties' joint venture agreement. Hover himself reminds us that a decree of specific performance "must, as nearly as possible, order performance according to its terms." That is what the trial court did in this case.

Both the court and the special master recognized that the Agreement did not provide for the preappraisal credits demanded by Hover. Section 7.3, on which Hover relied in asserting his claim, stated that "[w]hile the default exists" the defaulting party would "receive no rent or lease payments from the Bank under Article [5.2]."[9] It contained no penalty for the default in the form of forfeiture of the defaulting party's interest in the rent. The court did not err in refusing to add such a term to the Agreement absent any evidence of intent to include it. After receiving the special master's report, the court found no out-of-pocket loss or expenses other than the appraisal costs of $13,413.11. Though Hover was obligated to pay the appraisal fee under the contract, the court noted that the appraisal would not have been necessary but for Johnson's "default conduct;" it therefore agreed with the special master that a credit for the appraisal costs was equitably justified. We find no abuse of discretion in this ruling.

Hover also briefly argues that the court failed to grant him a credit for all rent payments Johnson received *after* the completion of the appraisal on December 28, 1999, which the court deemed to be the date on which title was transferred. He contends that "rents which are the property of the

---

[9]The court pointed out the obvious intention of the parties to refer to section 5.2 in this provision. Section 5.2 described the procedure for lease payments to be deposited into and received from an account at a financial institution. In the previous draft section 5.2 had been designated as section 7.3. The parties neglected to change the designation from "7.3" to "5.2" in the final Agreement.

purchaser after the date of transfer of title cannot continue to be debited in favor of seller to pay seller's personal debts existing on the date of that transfer without at least a reduction in the price to be paid." As Johnson points out, however, these were not personal debts but the debts of the joint venture. The debt to the lender was *Hover's* sole responsibility after December 28, 1999. The court did not err in allowing the partnership debt to be paid from the rental receipts. The amount remaining after the loan payments was properly credited to Hover.

## *Disposition*

The judgment is affirmed.

Premo, Acting P. J., and Rushing, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 19, 2003.