Filed 12/5/13  Gnesa v. Miroyan CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| HENRY GNESA, JR., et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> MICHAEL MIROYAN, <br><br> Defendant and Appellant. | F065029 <br><br> (Super. Ct. No. 655920) |
| MICHAEL MIROYAN, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> HENRY GNESA, JR., et al., <br><br> Defendants and Respondents. | (Super. Ct. No. 655938 <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County. William A. Mayhew, Judge.

Craig J. Bassett for Defendant and Appellant and for Plaintiff and Appellant.

Law Office of Ted M. Cabral and Ted M. Cabral for Plaintiffs and Respondents and for Defendants and Respondents.

-ooOoo-

## INTRODUCTION

Michael Miroyan appeals the judgment after a court trial pertaining to a real property sales contract. More specifically, Miroyan contends the trial court erred in holding the contract at issue provided for the sale of all 269 acres of real property located outside the City of Patterson. He asserts the contract permitted him to purchase an unsubdivided portion of an existing parcel on the property. Further, he contends the contract violates the Subdivision Map Act (Gov. Code, § 66410 et seq.; hereafter SMA) and is therefore void. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Henry Gnesa, Jr., individually and as trustee of a testamentary trust, Jill Gnesa, and Henry Gnesa, Sr. (jointly, the Gnesas; individual references to Henry are to Henry Gnesa, Jr.) own real property near Patterson, California. The property at issue here consists of four parcels totaling 269 acres. The land is used to grow almonds and walnuts. Water sources and irrigation are in place and a walnut huller is also located on the property.

In late 2004, the Gnesas and Miroyan entered into negotiations regarding the sale of the property. Henry testified Miroyan approached him regarding the sale; Miroyan testified Henry called him and asked him if he was interested in purchasing the property. In any event, after the parties' attorneys exchanged various drafts of the agreement, an agreement was executed between the Gnesas and Miroyan on January 6, 2005.

The agreement provided the Gnesas would sell 269 acres of real property to Miroyan at $32,500 an acre. A series of deposits were to be made by the buyer into an escrow account over the course of 15 years, and escrow was to close in May 2020.

In mid-2008, Miroyan was facing default because he was unable to pay the required deposit payment. As a result, the parties agreed to an addendum wherein certain deadlines would be extended in exchange for a forbearance payment of $73,000 to seller from buyer. It was signed by all parties.

2.

In late 2008 or early 2009, a meeting was held at the office of the Gnesas' counsel concerning upcoming deposit payments due in 2009. Henry and Jill Gnesa were in attendance, as was Miroyan. Henry recalled a discussion wherein Miroyan would be given more time within which to sell property he owned in San Jose in order to continue making payments or deposits toward this purchase. Miroyan testified he knew he would be "getting out" of the agreement in September or October 2008. During the meeting, the Gnesas wanted to know how he would make the 2009 payment. He told them the money would come from the sale of a ranch he owned in the San Jose foothills; he hoped that sale would conclude in January 2009.

Following the meeting, a 2009 addendum was prepared by the Gnesas' attorney, Richard Frampton. The addendum sought to modify certain deposit sums and deadlines, expedited the closing date to July 2015, and also sought to clarify section 6.1.1 of the original agreement. Frampton testified he believed the clarification of section 6.1.1 was needed because Miroyan brought up the subject of a partial sale or closing at the meeting.[1] Miroyan had brought up the subject during telephone conversations as well; on each occasion, Frampton would explain there would be no partial closing without everyone's agreement. Ultimately, however, the addendum was never executed by the parties.

Following the meeting, Miroyan asked his attorney, Terry Root, to draw up an amendment to the original agreement and to section 6.1.1 in particular. It called for a partial early closing of a 60-acre parcel for the purchase price of $1,950,000.[2] Miroyan forwarded the amendment to Frampton. The proposed amendment was not accepted or executed.

---

[1]Partial sales were not discussed in negotiations. The Gnesas were not interested in a partial sale.

[2]Miroyan had paid approximately $980,000 in deposit payments by this time.

In March 2010, a notice of default issued as Miroyan failed to make the 2009 deposit payments in accordance with the original agreement and the operative 2008 addendum.  On April 23, 2010, Frampton advised in a letter to Miroyan that the Gnesas were rescinding their notice of default in order to provide Miroyan the opportunity to cure his default or to negotiate some sort of settlement.  Henry indicated at that point he considered repaying Miroyan some portion of the forbearance payment to resolve the dispute and to cease having to deal with Miroyan.

Miroyan did not cure his default and settlement efforts were not successful.  He had not made a deposit or payment since 2008.  Henry authorized attorney Ted Cabral to issue another default notice.

Shortly thereafter, each party filed suit in the Stanislaus Superior Court.  The Gnesas' complaint sought to enforce the agreement's liquidated damages clause or, alternatively, an award of actual damages for Miroyan's breach.  They also sought a judicial declaration against Miroyan and Fidelity National Title Company (Fidelity) as follows:  that Miroyan had materially breached and repudiated the agreement; that as a result, the agreement was terminated and Miroyan had no interest, claim, or title in the property or against the Gnesas; that Miroyan was obligated to execute and tender a quitclaim deed to the Gnesas for recordation; and that Fidelity was required to record the deed it held in escrow.  Miroyan's complaint sought a judicial declaration that he was entitled to purchase 30 acres of the property, or a proportional share equal to the monies he had already paid.[3]

The cases were consolidated.  Following a five-day court trial, judgment was entered for the Gnesas, and Miroyan was to take nothing by way of his complaint.  This appeal followed.

---

[3]Miroyan was represented by attorney David K. Dorenfeld in defense of the Gnesas' complaint.  However, as to his own complaint against the Gnesas, Miroyan represented himself.

4.

## DISCUSSION

### I.    Standard of Review

Miroyan contends the appropriate standard of review is de novo review because resolution of the issues rests on the interpretation of the contract, and the material facts are not in dispute. The Gnesas counter that the correct standard is substantial evidence because the trial court resolved issues of fact after consideration of conflicting evidence, to which this court is bound if supported by the record.

> "When a trial court's construction of a written agreement is challenged on appeal, the scope and standard of review depend on whether the trial judge admitted *conflicting* extrinsic evidence to resolve any ambiguity or uncertainty in the contract. If extrinsic evidence was admitted, and *if* that evidence was in conflict, then we apply the substantial evidence rule to the factual findings made by the trial court. But if no extrinsic evidence was admitted, or if, as here, the evidence was not in conflict, we independently construe the writing. [Citations.]" (*De Anza Enterprises v. Johnson* (2002) 104 Cal.App.4th 1307, 1315.)

As a result, where the issue presented rests only on the interpretation of a written document and there is no need to consider conflicting extrinsic evidence regarding the proper interpretation, the issue is a question of law. The appellate court is in as good a position as the trial court to pass on these questions and is not bound by the trial court's interpretation. The correct standard of review is de novo. (*Southern Pacific Land Co. v. Westlake Farms*, *Inc.* (1987) 188 Cal.App.3d 807, 817; *Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 913.)

When, however, the meaning of the language of a contract is uncertain and parol evidence is introduced to aid in its interpretation, the duty of the trial court is to resolve the conflicts in the evidence and to interpret the language in light of the evidence found credible. (*Leep v. American Ship Management* (2005) 126 Cal.App.4th 1028, 1041.) When the trial court resolves the conflict, we are bound to the facts as determined by the trial court if those factual findings are supported by substantial evidence. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865; *Morey v. Vannucci*, *supra*, 64 Cal.App.4th at p. 913.) When interpretation turns upon the credibility of conflicting

5.

extrinsic evidence, we will uphold any reasonable construction of the contract by the trial court.  (*Morey v. Vannucci*, *supra*, at p. 913.)

In sum, the proper standard of review depends on whether and in what regard conflicting extrinsic evidence was needed to interpret a particular provision of the contract.  (See *City of Chino v. Jackson* (2002) 97 Cal.App.4th 377, 382-383.)  The paramount rule with regard to both of these standards is to give effect to the mutual intention of the parties as it existed at the time of contracting.  (*Warburton/Buttner v. Superior Court* (2002) 103 Cal.App.4th 1170, 1180 [when construing contracts, courts will look for expressed intent of parties, under an objective standard].)  The intention of the parties, however, must first be derived from the language of the contract.  (*Leo F. Piazza Paving Co. v. Foundation Constructors*, *Inc.* (1981) 128 Cal.App.3d 583, 591.)  It is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of a party, that controls.  A party's undisclosed intent or understanding is irrelevant.  (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 839 [interpretation of contract based on parties' mutual intent at time of contract formation]; *Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 980.)

Here, the trial court admitted conflicting extrinsic evidence to resolve the uncertainty regarding whether the agreement called for the sale of all 269 acres and whether section 6.1.1 of the parties' agreement required partial closings.  Material facts were most certainly in dispute.  We disagree with Miroyan that "at best" the interpretation of the agreement at issue here was based upon conflicting inferences "drawn from nonconflicting extrinsic evidence," thus requiring de novo review.  Consequently, we will determine whether substantial evidence supports the trial court's factual findings.

**II.  The Evidence Regarding the Sale of the Property**

Miroyan contends the Gnesas agreed to sell an unsubdivided portion of an existing parcel of their real property.  He contends this is so because the contract provides for and the sellers agreed to partial closings as provided in section 6.1.1.  The Gnesas assert the

agreement was always for the sale of all 269 acres, and section 6.1.1 allowed for the future possibility of a partial closing or closings.

## A.    Section 6.1.1

"<u>Closing Date and Increases to Purchase Price.</u>  Escrow shall close on or after a date occurring six (6) months after final approval by the City of Patterson of the final subdivision map ('Final Map') establishing the Real Property as separate legal parcels, with a final date for closing escrow occurring no later than May 1, 2020 ('Outside Closing Date').  Upon the further mutual agreement of the parties, there may be four or more separate Close of Escrow dates, so long as Seller is paid in full for the particular parcel(s) for which any Closing Date relates, and so long as this partial Closing does not result in the remaining Property being landlocked from Ward Avenue, or cut-off from the water supply on the Property.  Buyer and Seller shall mutually agree to the terms of any partial Closing as instructed to Escrow Holder.  Neither party is obligated to agree to such partial Closing.  Escrow shall close upon sixty (60) days written notice by Buyer. The closing of the purchase and sale (the 'Closing') and the close of escrow (the 'Close of Escrow') shall each be deemed to occur when the Grant Deed from Seller to Buyer (defined in Section 6.2 below) is recorded in the Official Records of Stanislaus County.  As used herein, the term 'Closing Date' means the date on which the Close of Escrow for all Real Property parcels occurs.  If the Closing Date does not occur by May 1, 2010, the Purchase Price for the Property will continue to increase by Three Hundred Fifty Thousand Dollars ($350,000).  On each subsequent May 1, anniversary date, through May 1, 2019, the Purchase Price for the property will continue to increase by Three Hundred Fifty Thousand Dollars ($350,000), annually, with a total possible increase to the Purchase Price by an amount of Three Million Five Hundred Thousand Dollars ($3,500,000)."

## B.    The Extrinsic Evidence Offered Below

Henry testified repeatedly that he never intended to sell anything less than the entire 269 acres near Patterson that is the subject of this dispute.  Further, he understood Miroyan wanted to buy all 269 acres.  Henry's attorney testified the agreement pertained to the sale of the entire 269 acres and nothing less.

On the other hand, Miroyan testified he never intended to purchase the 269 acres. Rather, he claimed he only entered into the agreement as a favor to Henry because Henry's wife was experiencing a significant health problem and needed a liver transplant.

Henry needed to sell the ranch to cover related medical costs.[4] Miroyan agreed to "park" some money in a lengthy escrow in exchange for some acreage commensurate with his investment. Miroyan claimed neither Henry nor Frampton said anything to him that would lead him to believe the Gnesas only wanted to sell the entire property. He believed he could buy as little or as much of the 269-acre property as he wished.

With specific regard to section 6.1.1, Henry testified he understood this section permitted him to consider a partial closing, but a partial closing was not required. He did not wish to subject the land to partial closings because the property had an integrated irrigation and drainage system on a crop rotation program. If he were to sell pieces of the property, it would become difficult if not impossible to farm.[5] Additionally, concerns regarding spraying, fumigating, and harvesting, as well as dust and noise, weighed against separate sales or closings. The language in section 6.1.1 that would permit separate closings required the mutual agreement of the parties. He believed the section was "pretty clear." Earlier draft versions of the agreement, and this section in particular, were objectionable because those versions did not include language requiring the parties' mutual agreement. When asked about the need for clarification of this section, as referenced in the unsigned 2009 addendum prepared by Frampton, Henry believed it was needed because there was concern Miroyan would not follow through with the purchase of the entire property as he was not making deposit payments timely. Also, the relationship between Henry and Miroyan was strained by that time.

Counsel for the Gnesas testified similarly. He did not recall any discussion about partial closings prior to January 3, 2005. Frampton indicated the language of section

---

[4]Jill Gnesa testified that in late 2004 she had an adverse reaction to an antibiotic, resulting in elevated liver enzymes. The condition resolved itself within a week's time when she quit taking the antibiotic. She denied being significantly ill and testified she was not bedridden during that time and continued to work 40-plus hours per week.

[5]The agreement permitted the Gnesas to continue farming the land until the close of escrow.

6.1.1 was drafted by Miroyan's attorney, Terry Root.[6]  During a series of draft agreements produced during the period between January 3 and 5, 2005, the attorneys, on behalf of their clients, negotiated the language of section 6.1.1.  (Plfs' Exhs. 26-31.)  The first two drafts of the parties' agreement did not include any language pertaining to possible partial closings.  In a draft version forwarded via e-mail on January 5 from Root to Frampton, the following language appeared for the first time in section 6.1.1:  "At Buyer's sole discretion there may be four or more separate Close of Escrow dates, so long as Seller is paid in full for the particular parcel(s) for which any Closing Date relates, and so long as Buyer and Seller mutually agree to the terms of the Closing …."  Frampton's reaction to the inclusion of this language was "extremely negative."  Partial closings cause "problems down the line" and he was not comfortable with the language.  Frampton advised Root "that we absolutely did not want part of this closing and the other part not closing," and he objected to the language giving the buyer complete discretion.  The next version of the draft agreement deleted the phrase "At Buyer's sole discretion" and replaced it with "Upon the further agreement of the parties."  Frampton objected to this language as well.  He advised Root he wanted stronger language, indicating it had to be "a mutual decision, that it would be looked at at the time that it was suggested, and that nobody be obligated to agree to a closing of part of the parcel."  Later that same date, another draft of the agreement was forwarded for review from Root to Frampton.  This version provided as follows:

> "… Upon the further mutual agreement of the parties, there may be four or more separate Close of Escrow dates, so long as Seller is paid in full for the particular parcel(s) for which any Closing Date relates, and so long as this partial Closing does not result in the remaining Property being landlocked from Ward Avenue, or cut-off from the water supply on the Property. Buyer and Seller shall mutually agree to the terms of any partial Closing as instructed to Escrow Holder.  Neither party is obligated to agree to such partial Closing."

---

[6]Miroyan testified he provided his attorney with a computer disk containing agreements used in his previous real estate deals.  Root was to use those agreements as a pattern for this deal.

Thus, as between these two drafts, from the first version to the second, the word "mutual" was added, as was the sentence providing that neither party was obligated to agree to a partial closing. The draft that followed did not include any changes to section 6.1.1. The Gnesas signed that version of the agreement the following day.[7] Miroyan also signed on January 6, 2005.

Miroyan testified Henry knew of his requirements regarding partial closings and partial sales. He testified he did not review the various iterations of the agreement because that is what he hired an attorney for. Miroyan told his attorney he wanted partial closings at the buyer's discretion, and he had partial sales in mind. He did not remember agreeing to the language in the final version of the agreement.[8] He recalled signing the version that gave him discretion. And he did not direct his attorney to approve the language changes in the drafts, although he admitted he did not read them, or only read portions of them. Miroyan believed Frampton's effort to clarify section 6.1.1 in the unsigned 2009 addendum was "subterfuge." He believed the parties' agreement provided it was the buyer's decision—his decision—to make a partial close or sale.

When parties to a contract introduce conflicting evidence to support their interpretation of uncertain language, the issue presented is one of fact to be determined by the trial court's observations and conclusions regarding credibility of witnesses. (*Abbate v. County of Santa Clara* (2001) 91 Cal.App.4th 1231, 1239.) A review of the record reveals there is substantial evidence to support the court's reasonable construction of the contract and its factual findings. Here, the trial court was faced with conflicting evidence regarding this agreement. It is plain the trial court accorded the testimony of the Gnesas and Frampton more weight than that offered by Miroyan.

---

[7]After the agreement was signed, certain corrections were made by an addendum, however, those amendments did not pertain to section 6.1.1.

[8]The final version was signed by Miroyan. He acknowledged the initials and signatures on the original agreement dated January 6, 2005, were his, but he testified he did not believe he read the document.

The Gnesas' exhibits further support the trial court's factual findings. The contract references the entire property, consisting of four assessor's parcels and 269 acres. The per acre price of $32,500 allows for modification of the total number of acres, and hence the total price, following review by a civil engineer or surveyor. The payment schedule calls for deposits in ascending values over the course of a 15-year period, and makes no reference to any deposit applying to any particular separate parcel. It gives the Gnesas the right to farm the entire property. And, significantly, while section 6.1.1 *allows for the possibility* of future partial closings, it does not, as Miroyan argues, require them.

In sum, the trial court resolved the conflicts in the evidence and interpreted the language of the agreement in light of the evidence it found credible. Because its findings of fact are supported by substantial evidence, we uphold the trial court's reasonable construction of those facts. (*Parsons v. Bristol Development Co.*, *supra*, 62 Cal.2d at p. 865; *Leep v. American Ship Management*, *supra*, 126 Cal.App.4th at p. 1041; *Morey v. Vannucci*, *supra*, 64 Cal.App.4th at p. 913.)

**III.    The Applicability of the Subdivision Map Act**

Miroyan contends the agreement is void in any event because it violates the provisions of the SMA. The Gnesas contend the SMA does not apply because the contract called for the sale of the entire 269 acres.

The SMA, the primary regulatory scheme for the subdivision of property in California, requires a subdivision to be designed in conformity with applicable general and specific plans and to include public improvements. (See *Gardner v. County of Sonoma* (2003) 29 Cal.4th 990, 996-997; *Hill v. City of Clovis* (2000) 80 Cal.App.4th 438, 445.) "To comply with the [SMA], the landowner must secure local approval and record an appropriate map." (*van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 564.) "The map, when recorded, gives constructive notice to transferees. [Citations.] Because it is recorded locally in the chain of title, it also

11.

partakes of the qualifications of a conveyance." (*John Taft Corp. v. Advisory Agency* (1984) 161 Cal.App.3d 749, 756.)

"The [SMA] has three principal goals:  to encourage orderly community development, to prevent undue burdens on the public, and to protect individual real estate buyers." (*van't Rood v. County of Sonoma*, *supra*, 113 Cal.App.4th at pp. 563-564; see *Gardner v. County of Sonoma*, *supra*, 29 Cal.4th at pp. 997-998; 61 Ops.Cal.Atty.Gen. 299, 301 (1978).)  To accomplish these goals, the SMA, among other things, generally prohibits the sale, lease or financing of any parcel of a subdivision until the recordation of an approved map in full compliance with the law (Gov. Code,[9] § 66499.30, subd. (a); see *Gardner*, at p. 999) unless the contract to sell, lease or finance "is expressly conditioned upon the approval and filing of a final subdivision map or parcel map …." (§ 66499.30, subd. (e).)  Violation of the SMA by the subdivider or an owner of record at the time of the violation is a criminal offense punishable by imprisonment, a fine or both. (§ 66499.31.)  Additionally, a grantee of property divided in violation of the SMA may bring an action to recover damages within one year of the date of discovery of the violation.  (§ 66499.32, subd. (b)); and any contract to purchase property may be void or voidable.  (§ 66499.32, subd. (a) [providing for the voidability of deeds or contracts violative of SMA]; see *Black Hills Investments*, *Inc. v. Albertson's, Inc.* (2007) 146 Cal.App.4th 883, 891-895 & fn. 4 [contract for sale of unsubdivided parcels in violation of SMA was void; § 66499.32 remedy of voidability applies only to sales of property divided in violation of SMA]; *Sixells*, *LLC v. Cannery Business Park* (2008) 170 Cal.App.4th 648, 653-654 [contract for sale of parcel before final map filed without being "'expressly conditioned'" on approval and filing of final subdivision or parcel map found void as matter of law at time executed].)

Miroyan's argument relies upon the assumption we will find the parties' agreement to be one for the purchase of subdivided land.  However, we have already

---

[9]All further statutory references are to the Government Code unless otherwise indicated.

determined it does not.  It merely allows for consideration of a partial future closing of a portion of the entire 269 acres.  And it does not require such a transaction.  Simply stated, this agreement does not involve the sale of any parcel or subdivided portion of a larger real property; it concerns the sale of 269 acres comprising four parcels.  There were to be no partial sales of one of the four parcels.  As a result, the requirements of a final map or parcel map pursuant to the SMA are not applicable to this purchase.  To the extent Miroyan makes additional arguments related to the SMA, we need not address them as the SMA does not apply.

## DISPOSITION

The judgment is affirmed.  Costs are awarded to respondents.


_____
PEÑA, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
CORNELL, J.

13.