[Civ. No. 15056. First Dist., Div. One. Sept. 12, 1952.]

ALFRED PAILHE, as Administrator, etc., Respondent, v.
RENE PIERRE PAILHE, Appellant.

Gus K. Burgren for Appellant.

Matthew Koppel and James G. Flaherty for Respondent.

BRAY, J.—An action by Alfred Paihle, individually, and one by him as administrator, against his brother Rene, were consolidated for trial. In the first mentioned action the court gave judgment for defendant. Plaintiff did not appeal.

In the second action the court decreed that defendant held certain real property and an insurance policy in trust for plaintiff as administrator. Defendant appeals.

### QUESTIONS PRESENTED
1. Sufficiency of the complaint.
2. Sufficiency of the evidence to show fraud and undue influence.
3. Were grantor's declarations subsequent to execution of deed admissible?
4. Where the only allegations concerning fraudulent transfer of the insurance policy were contained in the action which the court adjudged in defendant's favor, was the judgment that defendant held it in trust valid?
5. Erroneous findings and judgment.

### 1. SUFFICIENCY OF THE COMPLAINT

Inasmuch as the court found against plaintiff on his complaint as an individual we are concerned with the sufficiency of the administrator's complaint alone. At the beginning of the trial defendant moved to exclude all evidence on the ground that the complaint did not state causes of action. The court took the motion under advisement and apparently never ruled on it. The court's action amounts to a denial of the motion.

■ While the complaint is hardly a model of pleading, it is sufficient. The first count, after alleging the death of Elisabeth on September 28, 1948, the appointment of plaintiff as administrator, and the fact that plaintiff and defendant are her sons and sole heirs at law, alleges that she was the owner of certain real property in San Francisco; that prior to December 17, 1946, she was an elderly person suffering from severe illnesses and consequent pain and incapacitation; that defendant then represented to her that if she would convey the real property to him to the exclusion of plaintiff, defendant would care for her for the remainder of her days, would provide her with necessaries and reasonable luxuries, and would lift from her all worries, tribulations and labor of any description; that these representations were false and fraudulent, made without intent to perform them, and with the design that decedent would rely on them and deed the property to defendant; that decedent did rely on them and, further, placed the highest degree of trust and confidence in defendant; that a relationship of trust and confidence existed between decedent and defendant; that she was thereby

induced to and did sign and deliver to defendant a deed of said property; that defendant carried his fraudulent plan into effect by in nowise caring for decedent or in lifting her burdens and obligations, but did, in fact, make them heavier.

The second count incorporates all the allegations of the first count, and then alleges that in doing the things therein set forth defendant exercised undue influence and restraint over decedent's mind and thereby induced her to sign the deed in the following circumstancs, among others: that at such time decedent was not of sound and disposing mind but was in so extreme a condition of mental and physical weakness as to be unable to exercise a free will as to her affairs; that her volition was overcome by that of defendant, who thereby induced her to depart from her free desire to bequeath the property equally to plaintiff and defendant and induced her to grant it exclusively to defendant.

Defendant contends that the complaint merely sets forth conclusions and not facts, as was the situation in *Bacon* v. *Soule*, 19 Cal.App. 428 [126 P. 384]. In that case there was no allegation of confidential relationship. The action was between a brother and his sisters and the court pointed out that the brother-sister relationship alone did not raise a presumption of confidence and trust. But in our case not only was there a parent and child situation which the Bacon case holds raises a presumption of confidential relationship (p. 434), but in addition there was an allegation that such confidential relationship actually existed. The allegations in the first count of representations which defendant had no intention of carrying out, coupled with the allegation that decedent placed the highest degree of confidence in defendant, were somewhat similar to those which the court in *Alaniz* v. *Casenave*, 91 Cal. 41 [27 P. 521], held to be sufficient. As to the second count the allegations of control by defendant of decedent's mind, coupled with the allegations of confidence, were somewhat similar to those upheld in *Estate of Bixler*, 194 Cal. 585 [229 P. 704]. The allegations which defendant contends are mere conclusions were there held to be ultimate facts.

Defendant contends that the complaint is defective because there is no allegation of an offer to restore. He points out that there is also no allegation that defendant gave no consideration for the deed. However, it is alleged that the conveyance was a deed of *gift,* and, in the first count, that it was given on defendant's promise to provide for her,

etc., and that defendant did not keep that promise but actually made her burdens heavier. In the second count, it is alleged that decedent's volition was overcome by that of defendant. While the complaint could have been better drawn, it sufficiently informed defendant that plaintiff was claiming that defendant gave no consideration for the deed and hence there was nothing for plaintiff to offer to restore. Section 1691, subdivision 2, Civil Code, requiring an offer to restore in proper cases, does not apply. A number of the criticisms of the complaint cannot be raised on general demurrer. (See *Campbell* v. *Genshlea,* 180 Cal. 213, 217 [180 P. 336].) There was no special demurrer. Defendant was not harmed by the court's not requiring that particularity and technicality in pleading which the courts once required.

### 2. SUFFICIENCY OF THE EVIDENCE

 Elisabeth, the mother of plaintiff and defendant, lived since the death of her husband their father several years ago in a two-story, seven-room dwelling house in San Francisco belonging to her. She owned a life insurance policy for $500, taken out to cover funeral expenses, of which plaintiff was the beneficiary. In May, 1940, Elisabeth made a will leaving her property equally to her two sons and naming defendant executor without bonds. On November 27, 1946, she executed an endorsement on the insurance policy making defendant the beneficiary. In September, 1946, she went to Mr. Jean Arees, a notary public and an old friend of 30 years' standing, and had him prepare a will, which she executed, leaving the home to defendant and the residue of her estate to both sons. On December 17, 1946, she conveyed the home to defendant. Plaintiff was not informed of these transactions. In 1944 Elisabeth suffered a major stroke, leaving a partial paralysis on the left side. Dr. McClure testified that since that time she had been deteriorating mentally and physically. In the fall and winter of 1946 her reasoning powers were below normal and her memory was defective. He advised the family she should not live alone. It was difficult for her to coordinate her talk at times. Mr. Serresseque testified that she was crippled, could not do much work, and forgot a lot, forgetting something said to her only three hours previously. On shopping trips, however, she was able to take care of her business affairs and she paid her bills, and collected from her roomers. Mrs. Fitzpatrick took care of decedent for six months in 1944 when she had her first stroke. Her speech was such that she

did not use the correct words in her conversation. Mrs. Calinet, sister of decedent, testified that after decedent had her stroke in 1944 she became "vague." She suffered a second stroke for which she remained in the hospital from November 12 to December 8, 1946. She lived alone until defendant moved in with her in July, 1947.

Mr. Arees, the notary who prepared the gift deed, testified by deposition that decedent phoned his wife asking that the deed be prepared and for an appointment. He did not talk to defendant about the deed. Decedent told him that she did not want to divide the property between her sons as plaintiff "doesn't do anything for me." Arees had prepared a will for decedent in September, 1946, giving the home to defendant. (This will was destroyed by her direction prior to her death.) Both Arees and his wife testified that at the time of making the deed, decedent appeared to know what she was doing.

While decedent lived alone most of the time, defendant testified that she had made the appointment with Arees before defendant returned home from work. At that time defendant had not moved in with his mother but was "staying there." She told him about it and he told her to forget it. She said that if he would not go with her to Arees she would go there alone on a streetcar. Rather than have her go out alone in the rain he went with her. He told her he did not want any part of the property. At Arees' office he remained in a room other than the one in which the deed was drafted and executed. Arees reminded decedent that she had two sons and she said that defendant was the one who did everything for her so she left the house to him. Defendant admitted that over a period of three, four or five months he had discussed with her the fact that she wanted to give him the house, but she gave him no reasons why. There were discussions with his mother about defendant and his wife moving in with her, but he could not remember whether the subject of her giving him the house and the subject of their moving in were discussed at the same time. He denied that she ever asked him to take care of her for the balance of her days—he "volunteered to do that."

Witness Noucue testified that in May, 1946, defendant asked him if Arees could draw up some legal papers for his mother and stated that as soon as she gave him a deed he was going to move in with her. When the witness asked if

the brother knew about this, defendant stated that he would take care of himself—let the brother take care of himself.

Defendant's former wife, Ursulla, testified that "Finally it came up; she said she wanted him to have the home and everything that was in it"; ". . . they had an argument about it for some time, approximately three or four months, but the last month they decided that—he decided, and she decided that she would give him a deed." Defendant said he wanted no part of it. Decedent stated that because plaintiff had not come to see her for some long period of time and because plaintiff owed defendant $400 decedent was hurt and wanted to give defendant the property. The deed was executed December 17, 1946. Defendant and his then wife stayed overnight at the mother's home from the latter part of December, 1946, on. The mother wanted them to live there, but while they ate and slept there they continued to maintain their own apartment until July 1, 1947, when they moved in. In August, 1948, defendant had marital difficulties with his then wife and left the home, agreeing to return when his wife left. He visited and phoned his mother each day. It was when he left home that the mother asked for the deed back. Prior to 1946 plaintiff's wife took care of decedent's affairs, paying expenses by an allotment sent by plaintiff and by renting rooms in decedent's home. Defendant also sent his mother an allotment while he was in the service. From 1946 on defendant took care of his mother's affairs, collecting rentals for her. Plaintiff's wife paid the premiums on the $500 policy with the understanding that decedent was to pay French Hospital dues for her. When the wife learned that decedent did not pay these dues, she returned the policy and records to decedent who thereafter took care of the premiums. Plaintiff testified that he visited his mother once or twice a week from 1945 until her death.

At first, the defendant testified that his mother never told him her reasons for making the conveyance, and never asked the defendant to take care of her, but he later testified that his mother contended that since defendant was taking care of her, defendant should get the house and it was her idea that defendant was going to take care of her, but when this idea was expressed, defendant told her, "No, I do not like that idea; that is a bad idea." Defendant admitted that his mother may have told him that she was giving the house to him because he was taking care of her. Defendant's ex-wife, Ursulla, testified that she never promised the decedent that

she would take care of her and made no such agreement. The only reason she moved into the home was because the decedent and Dr. McClure requested it.

On the question of intent, the testimony of Mr. Flaherty, an attorney, and of Mrs. Fitzpatrick and Mrs. Calinet, was admitted. Mr. Flaherty testified that the decedent came to his office (shortly before her death) greatly upset because the deed could not be destroyed as could the will; that she told him that she made the deed with the understanding that defendant would take care of her for the balance of her life, and she would not have to work any more because the defendant and his wife were to move into the house and take care of everything, and look after her. Mr. Flaherty testified that he talked to defendant on the phone and told him that his mother had come to see him in an effort to get her property back, and the defendant is quoted as saying, "If that is my mother's wish, I will execute the deed." The next time Flaherty phoned defendant, Flaherty was referred to defendant's attorney (in a pending divorce proceeding with Ursulla). Flaherty testified that this attorney agreed to a return of the property as soon as the divorce was taken care of. Decedent told Mrs. Calinet that she gave the defendant the house thinking he would take care of her the rest of her days; that he did not do anything but give her a lot of grief; that he promised to take care of the decedent. Mrs. Fitzpatrick testified that she visited decedent in the hospital just before she died and while so visiting the defendant entered his mother's room, and his mother excitedly asked defendant for "the papers to my house," and defendant replied that he would give her the papers as soon as his divorce was over. Mrs. Calinet, decedent's sister, testified she talked with the defendant over the phone and he said he would give the deed back as soon as his divorce was finished. Defendant testified that had his brother gone to live with decedent and had she wanted plaintiff to have the house he would have deeded it to plaintiff; that it was decedent's feeling that whoever took care of her should have the house; also that the mother's idea was that if defendant would take care of her properly it was only fair that he have the house. Defendant also testified that prior to her death he had agreed to reconvey the house to her.

The evidence was conflicting and would have supported a finding that the mother was acting freely and voluntarily and without any fraud or undue influence of defendant. This

conflict, however, was resolved by the court in plaintiff's favor and we, of course, are bound thereby. There is sufficient evidence to support the court's finding that decedent was suffering from severe illnesses; that defendant had falsely represented that he would take care of her for the remainder of her days and relieve her of her cares and worries in consideration of her transferring the house to him; that the representations were false and that he did not perform as agreed; also that she placed the highest trust and confidence in him. Defendant's own testimony as related above, together with the other facts in the case, support this finding.

As to the finding of undue influence, the facts support it, too, particularly when the presumption which arises from the confidential relationship between defendant and the decedent is borne in mind. This presumption required the defendant to show by clear and unequivocal evidence that the advantage he obtained over his mother was not due to undue influence. This he did not do. The lack of independent advice to the mother and the fact that he admitted his mother's idea was that whoever took care of her should get the house, which he did not do, and the fact that he had agreed to reconvey the house to her, lends color to the claim that she was unduly influenced in making the conveyance.

While, of course, the burden is upon plaintiff to prove undue influence by clear, satisfactory and convincing evidence (*Sherman* v. *Sandell,* 106 Cal. 373 [39 P. 797]), that burden is met when advantage gained by a defendant through reliance by a grantor upon a confidential relationship is shown and the defendant fails to go forward with evidence to dispel the presumption of undue influence arising therefrom. (See *Myrick* v. *Bruetsch,* 13 Cal.App.2d 219 [56 P.2d 591].) See, also, *Payne* v. *Payne,* 12 Cal.App. 251 [107 P. 148], where the court upheld a finding of the trial court of undue influence even though "[t]he evidence does not show any intentional fraud or deceit on the part of defendant . . ." (P. 252.)

While the evidence in *Campbell* v. *Genshlea, supra,* 180 Cal. 213, was stronger than here, the language of the court concerning the daughter applies to defendant. The court said (p. 224) : "It is to be remembered that in a case involving a purported gift *inter vivos,* based upon an alleged consideration of love and affection, where the donee is a daughter having the control and direction of the aged donor, a strong presumption of confidential relation arises which

would place upon the beneficiary in the transaction the burden of showing fairness in dealing and full understanding on the part of the person parting with the property. (*Nobles* v. *Hutton,* 7 Cal.App. 14 [93 P. 289].)" *Nessen* v. *Nessen,* 218 Cal. 59 [21 P.2d 415], cited by defendant, is not applicable. There the trial court found that no undue influence was exercised on the mother by her son. In upholding that finding the Supreme Court stated that there was no showing of anything but the mother and son relationship and that such relationship *alone* was not sufficient to show undue influence. In our case, in addition to the blood relationship, the evidence shows the imposition of trust and confidence by the mother in the son, which confidence was abused.

### 3. Subsequent Declarations

■ Three witnesses testified to the same general effect, that after the execution of the deed, and out of the presence of the defendant, the decedent stated that she had made the deed with the understanding that defendant would take care of her for the balance of her life; that she believed that at any time defendant did not carry out his promises she could destroy the deed as she did the will made at the same time. This testimony was admitted solely on the question of intent. This was proper. " '. . . when the intention or state of mind of the alleged donor is involved, evidence of declarations made by him before or after the transaction is admissible though the declarations were not made in the presence of the adverse party [Citing cases.]' " (*Katz* v. *Enos,* 68 Cal.App.2d 266, 275 [156 P.2d 461].) ■ See, also, *Dinneen* v. *Younger,* 57 Cal.App.2d 200 [134 P.2d 323], where Mr. Presiding Justice Peters compiled the California cases upholding the rule that where intent is a material element of a disputed fact, declarations of a decedent made after as well as before an alleged act that indicate the intent with which he performed the act, are admissible in evidence as an exception to the hearsay rule. (See, also, *Estate of Anderson,* 185 Cal. 700 [198 P. 407]; 10 Cal.Jur., p. 1073, § 315, and § 319, p. 1078.)

### 4. Insurance Policy

■ In the action brought by Alfred personally, he set up, in addition to charges of fraud concerning the real property, that defendant obtained an endorsement to himself of the life insurance policy originally payable to Alfred. The court ruled that plaintiff take nothing in that case. The life

insurance policy is not mentioned in the pleadings in the action brought by the administrator, which is the only action before this court. However, in the findings and judgment in this action the court found that the endorsement of the policy was obtained by fraud and undue influence; that the policy is held by defendant in trust for the administrator, and ordered defendant to assign it to the administrator. The situation is quite unusual. While the court denied plaintiff, individually, any relief, it did find, in effect, all of the allegations of fraud and undue influence set forth in his complaint (the same as those set forth in the administrator's complaint) to be true. The findings were joint for the two actions. The issue of the validity of the assignment of the insurance policy was before the court. It felt that the fraudulently obtained property, real property and insurance policy, should be returned, not to plaintiff individually, but to the administrator, thereby making them available for creditors, if any, and eventually for them to be distributed to the two brothers. So far as the insurance policy is concerned, defendant obtained a benefit by this action of the trial court. In view of its findings of fraud in the assignment to defendant of the policy, technically, the court, in the individual action, should have caused the policy to be reassigned to plaintiff, as he was the sole beneficiary before the fraud was practiced. But the court in effect has made the policy available for both parties. Alfred is not complaining. In view of the fact that the issue was before the court, that the findings are joint as to the two actions, and that the court's action is just and equitable, this action was within the court's equity power. ▓▓▓ "It is one of the firmly established rules of equity that the court will, in one action, grant all the relief to which the parties are entitled, although at law such a result might strictly require several actions." (*Mau* v. *McManaman*, 29 Cal.App. 2d 631, 635 [85 P.2d 209].) Here the court in one action gave relief which it might have given in the two actions. "It is the policy of the law to allow a party to obtain in one action all the relief to which he may be entitled on account of a single transaction, although such relief may be of a character that would require several suits under the strict rules relating to the forms of common-law actions prior to the adoption of the codes." (*Newport* v. *Hatton*, 195 Cal. 132, 153 [231 P. 987].) ▓▓▓ Here was a proper situation for the application of the rule that where equity has acquired jurisdiction for one purpose it will retain that jurisdiction to

the final adjustment of all differences between the parties arising from the causes of action presented.

## 5. FINDINGS AND JUDGMENT

The court found that decedent was "an elderly person suffering from severe illnesses and consequent pain and incapacitation, who had abandoned hope of an extended further life . . ." Defendant contends there is no support for this finding. The evidence fails to disclose her age although there is some intimation that at the time of the execution of the deed she was 53. She was suffering from severe illnesses (having had two strokes) and consequent pain. The doctor testified that she had gradually deteriorated both mentally and physically. There was some incapacitation. While the finding as a whole may have been stronger than the evidence fully warranted, that fact is unimportant. The other findings would support the judgment even in the absence of this finding. As to the finding that plaintiff made the representations without intent to perform, such finding is a reasonable inference from the facts. Again, while the court found that after the delivery of the deed defendant "in nowise car[ed] for her," and the evidence shows that to some extent he did, it also shows that he did not care for her or lift her burdens or obligations as agreed; in fact, he made her burdens heavier.

In view of the presumption which followed the relationship of trust and confidence and the facts in the case we find nothing wrong with the findings on undue influence. While love and affection can constitute a sufficient consideration for a conveyance of real property, the evidence here shows that it was not the true consideration for the deed and that the finding that there was no consideration for the deed is well supported. It is not necessary to consider each specific finding complained of by defendant, which includes practically every one of the findings, for the reason that those necessary to support the judgment are based on the evidence and any which are not fully so based are not necessary to the judgment.

Technically speaking, the judgment may have gone too far. It held that defendant held the title to the real property and the insurance policy in trust for plaintiff *as administrator*, ordered defendant within a limited period to reconvey the real property and assign the insurance policy to plaintiff *as administrator* and decreed that in the event of a failure so to

do title would vest in the administrator. This was proper. The judgment then provided that defendant and all persons claiming under or through him be restrained and enjoined from asserting any right, title or interest in the real property or policy. If this means only, and undoubtedly the court intended it so, that defendant is restrained from making any claim to either as against the administrator during probate, then the wording is proper. On the other hand, if it means that as an heir defendant is not entitled to claim on distribution his share as an heir, then it is wrong. Except in a highly technical way, we do not see how such a construction can be given the judgment. As an heir (in the absence of a will otherwise disposing of the property) title vested in defendant, subject, however, to the administration of the estate. Therefore, the only construction that reasonably can be given the judgment is that defendant's right to claim half of the property and policy on distribution is not affected.

The judgment did not specifically order defendant to surrender possession of the real property to the administrator. It did so indirectly by giving the administrator judgment for $500 (apparently for his possession of the property after the mother's death) and $100 per month until such surrender is made. The record fails to disclose how the trial court arrived at these figures. Defendant moved into the premises about two and a half months after his mother's death and has continued to reside there. The trial started May 2, 1950. We are permitted to take judicial notice of the estate proceedings. It there appears that the first publication of notice to creditors was had on October 25, 1948. Therefore, at the time of trial the time to file or present claims had expired. Section 581 of the Probate Code provides that after such time has expired, as to "any heir who has succeeded to the property in his possession" (and defendant has so succeeded to a half interest therein), the administrator may not recover possession unless he proves that such possession is necessary for the payment of debts, legacies or expenses of administration, or for distribution to some heir entitled thereto. There is no such proof here. Therefore, this award must fall. While Alfred is a coowner of the title with defendant, subject to administration, the administrator cannot bring an action for possession from a coowner. His right as administrator to bring such action for the estate has terminated. Nor is this action one for rents, issues and profits due to the estate under section 581. The question of whether

plaintiff individually as coheir with defendant may require an accounting from defendant is not before us in this action.

That portion of the judgment awarding plaintiff $500 and the sum of $100 per month until defendant surrenders possession of said property is reversed. In all other respects the judgment is affirmed. Each party will bear his own costs.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied October 11, 1952, and appellant's petition for a hearing by the Supreme Court was denied November 10, 1952.