Filed 11/13/14  Shalikar v. Shalikar CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| OLGA SHALIKAR et al., | |
| Plaintiffs and Appellants, | E056412 |
| v. | (Super.Ct.No. RIC419394 & RIC419424) |
| MOHAMMAD I. SHALIKAR et al., | O P I N I O N |
| Defendants and Respondents. | |
| MOHAMMAD I. SHALIKAR et al., | |
| Plaintiffs and Respondents, | |
| v. | |
| TOURYALAI SHALIKAR et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  John W. Vineyard, Judge.

Affirmed.

The Law Office of John Derrick and John Derrick for Plaintiffs, Defendants, and Appellants.

Law Offices of Lawrence R. Bynum and Lawrence R. Bynum for Plaintiffs, Defendants, and Respondents.

## I.  INTRODUCTION

Plaintiff, defendant, and appellant Touryalai Shalikar and plaintiff, defendant, and respondent Mohammad Shalikar are brothers.[1]  They jointly owned certain businesses and real property, including four parcels of land in Hesperia.  They have been litigating disputes regarding these properties and other matters since at least 2004.

In 2006, Touryalai and Mohammad entered into a settlement agreement.  The agreement called for Touryalai to transfer his interest in the four Hesperia parcels to Mohammad and for Mohammad to transfer other property to Touryalai.  For the next three years, neither side performed their obligations under the agreement or demanded that the other do so.  In the meantime, they sold three of the four Hesperia parcels to the City of Hesperia (the City) in response to the City's threat of condemnation proceedings.  The proceeds for the parcels were split evenly between Touryalai and Mohammad.  The parties continued to jointly hold one Hesperia parcel.

---

[1]  Because Touryalai and Mohammad share the same last name, we will refer to them by their first names.  Touryalai's and Mohammad's wives are also parties to the underlying litigation and this appeal.  In their briefs on appeal, both sides refer only to the brothers' names in the interests of brevity.  Without meaning any disrespect for any party, we will abide by that convention for the sake of brevity as well as avoiding confusion.

In 2009, as the trial between them began, Mohammad moved to have judgment entered on the settlement agreement pursuant to section 664.6 of the Code of Civil Procedure.[2]  Over Touryalai's opposition, the court granted the motion.  Soon afterward, both sides filed motions to interpret and enforce the agreement.  In ruling on these motions, the court concluded that the four jointly held Hesperia parcels were not covered by the agreement.  Mohammad appealed to this court and, in an unpublished opinion, we reversed.  (*Shalikar v. Shalikar* (Mar. 10, 2011, E050447) [nonpub. opn.] (*Shalikar I*).)[3]

We concluded that the agreement and judgment called for Touryalai to transfer his interest in the four Hesperia parcels to Mohammad.  We modified the court's order to direct Touryalai to transfer his interest in the one Hesperia parcel that remained jointly held to Mohammad.  As for the proceeds Touryalai obtained from the sale of the three parcels to the City, we directed the trial court to consider that issue upon remand.

Following remand, an evidentiary hearing was held to consider the remaining issues.  The trial court ordered Touryalai to pay to Mohammad the amount he received in exchange for the three sold parcels, plus prejudgment interest.  Touryalai appealed.

---

[2]  All further statutory references are to the Code of Civil Procedure unless otherwise indicated.  Section 664.6 provides:  "If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement.  If requested by the parties, the court may retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement."

[3]  We take judicial notice of our opinion in *Shalikar I* and of the record on appeal in that case.  (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

We affirm.

## II.  SUMMARY OF FACTS AND PROCEDURAL HISTORY

A.  *Background:  The Litigation, the Settlement Agreement, and the Judgment*

Touryalai sued Mohammad, among others, in 2004.  In August 2005, Touryalai filed a first amended complaint alleging disputes concerning certain business and real property transactions involving the parties.  Touryalai sought a variety of remedies, including rescission, specific performance, damages, quiet title, partition and accounting, and declaratory relief.[4]  Among the properties Touryalai sought to partition were various parcels he owned jointly with Mohammad in Hemet, Victorville, and Hesperia.

In August 2006, the parties entered into a written settlement agreement.  The agreement consisted of five numbered paragraphs.  Under the first paragraph, Mohammad was to transfer certain property in Hemet and Sun City to Touryalai.  Under the second paragraph, Touryalai was to transfer to Mohammad his interest in a parcel of land in Victorville and an unspecified "4 parcels of land" in Hesperia.  The third paragraph required Touryalai to pay $150,000 to another family member; paragraph four addressed restrictions on the parties' abilities to compete against each other; and paragraph five provided for the removal of liens on Mohammad's properties in Hesperia and Homeland.

---

[4]  The register of actions for the case indicates that Mohammad commenced a separate action against Touryalai, that the two actions were consolidated, and that Mohammad subsequently filed a cross-complaint in the consolidated case.  The pleadings filed by Mohammad are not included in our record on appeal.

4

Despite the agreement, the litigation between the parties continued.[5] Mohammad did not transfer or tender the Hemet or Sun City properties to Touryalai, and Touryalai did not transfer or tender the Hesperia or Victorville properties to Mohammad. In February 2008, Touryalai filed a second amended complaint that included the claims asserted in the first amended complaint and added additional claims. It did not mention the settlement agreement.

In 2007 or 2008, the City of Hesperia contacted Touryalai about the City's interest in acquiring, by eminent domain if necessary, an easement over one of the jointly held Hesperia parcels for a drainage project. Touryalai referred the City to Mohammad because Mohammad "has experience in real estate." Mohammad thereafter conducted most of the negotiations with the City.

Although the City sought an easement over one parcel only, Mohammad negotiated to have the City purchase three of the Hesperia parcels. The initial form of escrow instructions called for the purchase money to be disbursed to Touryalai and Mohammad jointly. The escrow instructions were thereafter modified to provide for separate checks to each party. According to Touryalai, this was done because Mohammad "was very broke at the time and . . . wanted to split the checks" so that each

---

[5] Mohammad explains that shortly after the settlement agreement was signed, two nephews who had not signed the agreement intervened and joined in the action. Touryalai subsequently added other parties to the case. Because the new parties to the lawsuit were not parties to the settlement agreement, Mohammad was "prevented" from moving to enforce the settlement. In July 2009, the additional parties were dismissed from the lawsuit and, one week later, Mohammad moved to have judgment entered based on the settlement agreement.

5

received one-half of the proceeds. Mohammad testified that while he agreed to separate checks, he believed their agreement was in effect at that time and that the proceeds did not affect the agreement. The transaction closed in October 2008. They each received $633,517.66. According to Touryalai, once they received their checks, they "never talked about it."

In July 2009, as trial in the case commenced, Mohammad filed a motion to have judgment entered pursuant to the terms of the settlement agreement. In opposing the motion, Touryalai's counsel argued that "there are issues of enforcement that will immediately pop up, and the parties would be obliged to file motions to deal with those questions of interpretation and modification, whatever those issues are." He further asserted that granting the motion would "spark a whole series of issues that we'll have to deal with which will result in post ruling motions."

After the court indicated it would grant the motion, the court asked Touryalai's counsel whether he would object to the court's continuing jurisdiction. The attorney responded: "I really do not, Your Honor, because it's pretty clear to me that the Court may be called upon to make further orders to carry out the judgment, whatever the judgment is." None of the parties personally requested or expressly stipulated to the court's continuing jurisdiction.

The judgment attached and incorporated the settlement agreement. The judgment further provides: "Pursuant to the parties' stipulation, the Riverside Superior Court retains jurisdiction to enforce the judgment."

6

B. *Postjudgment Motions and Shalikar I*

Within three months after the judgment was entered, both sides filed motions calling for the interpretation and enforcement of the judgment. Mohammad filed a motion to enforce the judgment in October 2009. According to Mohammad, Touryalai was required under paragraph 2 of the settlement agreement to transfer his interest in a certain Victorville parcel and four specific parcels in Hesperia that they had held jointly when the agreement was made, including the three parcels that were sold to the City in 2008. Mohammad requested an order directing Touryalai to execute deeds to the remaining Hesperia parcel and the Victorville parcel and, as to the three sold parcels, a writ of execution covering Touryalai's proceeds from the sale.

Touryalai opposed the motion and asserted that the "4 parcels of land" referenced in paragraph 2 of the settlement agreement are not the jointly held Hesperia parcels identified by Mohammad, but rather four different parcels held in Mohammad's name alone.

In November 2009, Touryalai filed a motion for an injunction to prevent Mohammad from competing against Touryalai in violation of the settlement agreement. According to Touryalai, the motion was made "in aid of enforcement of the judgment" and recited that, "[p]ursuant to the stipulation of the parties, the court retained jurisdiction to enforce the judgment."

Mohammad's motion to enforce the judgment and Touryalai's motion for an injunction were heard together in January 2010. The court granted Mohammad's motion

7

in part and issued orders directing the transfer of certain properties among the parties. However, the trial court agreed with Touryalai's interpretation of paragraph 2 and, consequently, made no order concerning the remaining jointly held Hesperia parcel or the proceeds from the sale of the other three parcels. The court also granted Touryalai's motion in part and ordered Mohammad to close a certain business he was operating in violation of the noncompetition provision of the agreement.

In February 2010, pursuant to the court's January 2010 orders, Mohammad transferred to Touryalai the Sun City and Hemet properties and Touryalai transferred to Mohammad the Victorville property. Touryalai also paid the $150,000 payment required under paragraph 3 of the agreement.[6]

Mohammad appealed. In *Shalikar I*, we agreed with Mohammad and construed the "4 parcels of land" referenced in paragraph 2 to mean the four Hesperia parcels identified by Mohammad. With respect to the parcel that was still held jointly by the parties, we modified the court's order to require that Touryalai transfer his interest in that parcel to Mohammad. As for Mohammad's request that Touryalai be ordered to turn over his share of the proceeds for the sale of the other three parcels, we stated: "[W]e think the appropriate remedy is to direct the trial court to consider that request following remand. . . . [T]he trial court never reached the question of [Mohammad's] right to the proceeds. If it has jurisdiction to consider the question, its resolution may involve

---

[6] The agreement called for this payment to be made to Najiba Faizy. After Faizy assigned her right to the payment to Mohammad, Touryalai made the payment to Mohammad.

8

equitable considerations, factual determinations, and the exercise of judicial discretion that are more properly within the province of the trial court. The trial court should be given the opportunity to address such issues." Specifically, we concluded: "Upon motion by [Mohammad] following remand, the court shall consider [Mohammad's] request to modify the judgment by providing for an order that [Touryalai] pay [Mohammad his] share of proceeds from the sale of three jointly held parcels to the City of Hesperia."

C. *Postremand Motion to Enforce the Judgment*

Following remand, Mohammad filed the motion permitted by *Shalikar I*. He sought $633,517.33 in principal plus $140,332.50 in prejudgment interest. After the submission of opposing and reply papers and oral argument, the court ordered an evidentiary hearing and further briefing.

The evidentiary hearing was held on February 24, 2012. In addition to testimony from Touryalai and Mohammad, the court heard testimony from a representative of the City who was involved in the negotiations for the sale of the three Hesperia parcels, the escrow agent involved in the sale, and a nephew of the parties.

On May 22, 2012, the court issued an order and written findings. The court stated that "[p]ursuant to the parties' settlement, [Mohammad was] the equitable owner[] of the three Hesperia parcels on the date of the sale. (*Rogers v. Davis* (1994) 28 Cal.App.4th 1215 [[Fourth Dist., Div. Two] (*Rogers*)].) Any other result would constitute a windfall to [Touryalai] and would frustrate the intent of the parties as reflected in their settlement

9

agreement, now judgment. As a result, [Mohammad is] entitled to recover the proceeds of that sale, less an offset of $59,403.60, along with prejudgment interest . . . plus 10% post judgment interest . . . ." The offset was based on Touryalai's payment of mortgage payments and other expenses relating to the sold Hesperia parcels.

With respect to the issue of whether Mohammad waived his right to the proceeds of the sale, the court found that Touryalai "did not meet [his] burden of proving that [Mohammad] acted, voluntarily, in any manner so inconsistent with [his] rights as to induce a reasonable belief that such rights had been relinquished."

Touryalai appealed.

### III. DISCUSSION

A. *Jurisdiction*

Touryalai contends that the trial court did not retain jurisdiction after the judgment was entered. In particular, he asserts that the court's purported retention of jurisdiction was ineffective because section 664.6 authorizes the retention of jurisdiction only when the parties (and not merely their counsel) request it, and the parties did not do so in this case. As we explain below, we reject this argument because, regardless of whether the parties must personally request the court to retain jurisdiction under section 664.6, the court has the inherent power to retain jurisdiction to enforce and interpret the judgment and to resolve remaining issues to avoid further litigation.

Ordinarily, a trial court's "'jurisdiction over the parties and the subject matter . . . continues *until a final judgment is entered* . . . .' [Citation.]" (*Diamond Heights Village*

10

*Assn., Inc. v. Financial Freedom Senior Funding Corp.* (2011) 196 Cal.App.4th 290, 305.)  However, a court retains jurisdiction to "compel obedience to its judgments, orders, and process . . . ."  (§ 128, subd. (a)(4).)  In cases involving equitable claims and relief, such jurisdiction has been expressed in broad terms:  "'The jurisdiction of a court of equity to enforce its decrees is coextensive with its jurisdiction to determine the rights of the parties, and it has power to enforce its decrees as a necessary incident to its jurisdiction.  Except where the decree is self-executing, jurisdiction of the cause continues for this purpose, or leave may be expressly reserved to reinstate the cause for the purpose of enforcing the decree, or to make such further orders as may be necessary.  [Citations.]  A court of equity can mold its decrees to suit the exigencies of the case.  [Citation.]  Where equity has acquired jurisdiction for one purpose, it will retain that jurisdiction to the final adjustment of all differences between the parties arising from the causes of action alleged.  [Citations.]  Where a court has taken jurisdiction of a suit in equity it may determine all legal as well as equitable issues in order to completely dispose of the matters in controversy.  [Citations.]'"  (*Day v. Sharp* (1975) 50 Cal.App.3d 904, 912-913, quoting *Klinker v. Klinker* (1955) 132 Cal.App.2d 687, 694; accord, *Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1161.)

The power to retain and exercise postjudgment jurisdiction by a court in equity in order to interpret the judgment and determine unresolved issues and future problems is well settled.  (See, e.g., *Dawson v. East Side Union High School Dist.* (1994) 28 Cal.App.4th 998, 1044-1045; *Day v. Sharp, supra,* 50 Cal.App.3d at pp. 911-913;

11

*Rynsburger v. Dairymen's Fertilizer Coop., Inc.* (1968) 266 Cal.App.2d 269, 278-279 [Fourth Dist., Div. Two]; *Ecker Bros. v. Jones* (1960) 186 Cal.App.2d 775, 787; see also *Roden v. AmerisourceBergen Corp.* (2005) 130 Cal.App.4th 211, 217 ["court showed exquisite foresight" in retaining jurisdiction "to entertain and resolve [future employment] benefits issues"]; see generally 2 Witkin, Cal. Procedure (5th ed. 2008) Jurisdiction, § 420, pp. 1070-1071.) Indeed, even in the absence of an express reservation of jurisdiction, "[a]n equity court has inherent power to make its decree effective by additional orders affecting the details of performance . . . ." (*Barnes v. Chamberlain* (1983) 147 Cal.App.3d 762, 767; accord, *Palmco Corp. v. Superior Court* (1993) 16 Cal.App.4th 221, 225.)

The postjudgment exercise of jurisdiction in equity cases is supported by policies favoring judicial economy and finality; by resolving issues that remain after judgment is entered, the court is able "to do full and final justice between [the parties] without the necessity of filing a new action." (*Day v. Sharp, supra,* 50 Cal.App.3d at p. 912; see also *Pailhe v. Pailhe* (1952) 113 Cal.App.2d 53, 64 [in exercising its equitable powers, the court can, "'in one action, grant all the relief to which the parties are entitled, although at law such a result might strictly require several actions.'"].)

Here, there is no dispute that the parties' claims and the remedies employed to resolve them are predominately equitable in nature: Touryalai claims included rescission,

specific performance, quiet title, partition and accounting, and declaratory relief;[7] the judgment establishes the parties' rights to real and personal property, requires transfers of property to reflect those rights, and sets restrictions on the parties' abilities to compete against each other. Under the authorities cited above, the court had continuing jurisdiction to make the "'final adjustment of all differences between the parties'" and "'determine all legal as well as equitable issues in order to completely dispose of the matters in controversy.'" (*Day v. Sharp, supra,* 50 Cal.App.3d at pp. 912-913.)

The court's retention of jurisdiction was particularly appropriate in light of the recognition by the parties and the court that the entry of judgment would not end the matter. For example, at the hearing on Mohammad's motion to have judgment entered, Touryalai's counsel argued that "there are issues of enforcement that will immediately pop up, and the parties would be obliged to file motions to deal with those questions of interpretation and modification . . . ." The remaining issues include the "interpretation of the obviously ambiguous language of the document" and "the effect of one or more parties disabling themselves from performing" under the agreement. When the court inquired whether Touryalai's counsel would object to the court's continuing jurisdiction, counsel said he would not "because it's pretty clear . . . that the Court may be called upon to make further orders to carry out the judgment . . . ."

---

[7] Our record does not include Mohammad's pleadings. However, in his October 2009 motion to enforce the judgment, Mohammad refers to his "Complaint for Partition of Real Property and Acctg."

Indeed, soon after the judgment was entered both sides took advantage of the court's retained jurisdiction by filing motions calling for the court to interpret and enforce different provisions of the settlement agreement:  Mohammad filed his motion to enforce the judgment, the ruling on which was the focus of *Shalikar I*, and Touryalai filed his motion to enjoin Mohammad from certain competitive practices "in aid of enforcement of the judgment . . . ."  In support of his motion, Touryalai expressly relied on the parties' stipulation to have the court retain jurisdiction.[8]

In light of the equitable nature of the claims and the remedies, the near-certainty of postjudgment disputes, and the interest in avoiding new and multiple lawsuits, the court's express retention and exercise of jurisdiction was appropriate and amply supported by the authorities cited above.

The primary focus of Touryalai's argument is that the retention of jurisdiction under section 664.6 is effective only if it was "requested by the parties."  (§ 664.6.) Touryalai relies on the second sentence of section 664.6, which provides:  "If requested by the parties, the court may retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement."  This language was construed in

---

[8] Touryalai's reliance on the court's retained jurisdiction to support his postjudgment motion for injunctive relief arguably supports an argument that he is judicially estopped from asserting that the court did not have jurisdiction to hear Mohammad's motion.  (See, e.g., *Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986 ["""Judicial estoppel precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position."""].)  Because Mohammad does not explicitly rely on this theory and it is unnecessary to reach our decision, we do not decide this issue.

*Wackeen v. Malis* (2002) 97 Cal.App.4th 429, as requiring that the request to retain

jurisdiction "must be made by the parties, not by their attorneys, spouses or other such

agents." (*Id.* at p. 433.) It does not, however, apply here.

The second sentence of section 664 was added to solve "the problem presented in

[one case], where the trial court lost jurisdiction of a case, and hence the ability to enforce

a settlement agreement, because the terms of the stipulated settlement required or

contemplated that the case would be dismissed." (*Wackeen v. Malis, supra,* 97

Cal.App.4th at p. 439.) With the addition of the second sentence to section 664.6, even

after a settled case is dismissed, "the court may nevertheless retain jurisdiction to enforce

the terms of the settlement, until such time as all of its terms have been performed by the

parties, *if the parties have requested this specific retention of jurisdiction.*" (*Ibid.*; see

also *Hines v. Lukes* (2008) 167 Cal.App.4th 1174, 1182 ["The court retains jurisdiction to

enforce a settlement under the statute even after a dismissal, but only if the parties

requested such a retention of jurisdiction before the dismissal."].)

Here, the court was never presented with the problem that the second sentence of

section 664.6 was intended to resolve. The settlement agreement did not call for the

dismissal of the case and the parties never dismissed the case. Nothing in section 664.6

or the authorities cited by Touryalai abrogates the principles regarding the retention of

jurisdiction discussed above. Thus, if the trial court could retain jurisdiction based on its

inherent powers to enforce the judgment, there was no need to resort to the jurisdiction

retention provision of section 664.6 or to require the personal request or stipulation of the

15

parties. As discussed above, there is ample authority for the court's retention of jurisdiction in this case, and it could do so without regard to whether the parties personally requested it. We therefore reject Touryalai's argument.

Under separate headings, Touryalai contends that even if the court had jurisdiction to enforce the judgment, the court's order to turn over the sale proceeds went beyond mere enforcement and "*changed* the terms of the judgment." There is, he asserts, "*a big difference between a judgment of specific performance and an order to pay money*."[9]

We conclude that the court's order was within its jurisdiction. The settlement agreement and judgment required Touryalai to transfer his interest in the four Hesperia properties to Mohammad—an equitable remedy within the scope of the claims between the parties. Because three of the four parcels had been sold, Touryalai could not comply with the judgment or any order that he transfer his interest in those parcels. Yet Mohammad had complied with his obligations to transfer the Sun City and Hemet properties to Touryalai. Thus, if, as Touryalai argues, the court could do nothing further, Mohammad would be deprived of a key benefit of the settlement agreement (the three Hesperia parcels) and Touryalai would receive an undeserved windfall (the proceeds

---

[9] We anticipated this issue in *Shalikar I* when we noted: "[I]t is not clear to us that the trial court's retained jurisdiction to enforce the judgment includes the power to order [Touryalai] to pay money to [Mohammad]. The jurisdiction to enforce a judgment is 'reserved to modify[ing] procedural provisions, not to materially change the adjudication of substantial issues.' (7 Witkin, Cal. Procedure [(5th ed. 2008)] Judgment, § 80, p. 616.) Arguably, an order for the payment of money would be a substantive change to the judgment beyond a mere procedural modification." (*Shalikar I, supra,* at pp. 19-20.) Because the issue had not been briefed, we declined to express any view concerning the merits of such an argument. (*Id.* at pp. 20-21.)

16

from the sale of the parcels).  Clearly, "full and final justice" would not be achieved—at least not without another lawsuit and further litigation.  (See *Day v. Sharp, supra,* 50 Cal.App.3d at p. 912.)

Fortunately, the law does not require such inefficiency.  As discussed above, when, as here, "'a court has taken jurisdiction of a suit in equity[,] it may determine all legal as well as equitable issues in order to completely dispose of the matters in controversy.  [Citations.]'" (*Day v. Sharp, supra,* 50 Cal.App.3d at p. 913.)  In *Shalikar I,* we specifically directed the trial court to consider whether Touryalai should be ordered to pay to Mohammad the proceeds Touryalai received from the sale of the three parcels. That question is thus indisputably an issue that remains in this case, the resolution of which is necessary for the complete disposition of the matter.  The trial court, therefore, had jurisdiction to determine that issue.

B. *The Merits*

Touryalai next contends that the court's decision on the merits was erroneous. More specifically, he asserts the court erred in applying the doctrine of equitable conversion and in finding that Mohammad had not waived his right to the sale proceeds. In addition, Touryalai contends that Mohammad is barred by the doctrine of judicial estoppel from receiving the relief he sought.  We reject these arguments.

1. The Standard of Review

Initially, we reject Touryalai's argument that we should apply a de novo standard of review with respect to the trial court's conclusions.  As Touryalai acknowledges, a trial

17

court's exercise of its equitable powers is generally reviewed for abuse of discretion. (See *Ho v. Hsieh* (2010) 181 Cal.App.4th 337, 345; *De Anza Enterprises v. Johnson* (2002) 104 Cal.App.4th 1307, 1315.) However, Touryalai argues that the court's order in this case is analogous to a summary judgment based on equitable defenses, which is reviewed under the de novo standard. (See, e.g., *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 67-68.) We disagree. Rulings on summary judgment motions are reviewed under the de novo standard because the "'motions raise *only questions of law* regarding the construction and effect of the moving and opposing papers . . . .' [Citations.]" (*Hamburg v. Wal-Mart Stores, Inc.* (2004) 116 Cal.App.4th 497, 502-503.) Here, by contrast, the proceeding involved live testimony where the court could observe the demeanor of the witnesses and assess their credibility. The hearing on the motion was more akin to a trial than a summary judgment motion. Accordingly, we reject the contention that we should depart from the deferential standard of review generally applicable to equitable determinations.[10]

In reviewing the court's ruling under the abuse of discretion standard, we observe that "'"[t]he discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.

---

[10] A deferential standard of review is also implicit in *Shalikar I*, where we directed the parties to raise these issues in the trial court on remand because their resolution "may involve equitable considerations, factual determinations, and the exercise of judicial discretion that are more properly within the province of the trial court." (*Shalikar I, supra,* at p. 21.)

[Citation.]'" [Citations.] The scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion." (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297.)

2. Equitable Conversion

Mohammad's claim to Touryalai's sale proceeds and the court's ruling were based upon the doctrine of equitable conversion. Under this doctrine, "[w]hen a binding executory contract for the sale of real property is entered into, an equitable conversion of the property . . . occurs under which the purchaser is deemed to be the equitable owner of the property and the seller the owner of the purchase money, with an equitable lien on the property for the balance of the unpaid purchase price. The vendor is regarded as holding the legal title in trust for the purchaser; the purchaser, in turn, is considered the trustee of the purchase money for the benefit of the vendor." (*Mamula v. McCulloch* (1969) 275 Cal.App.2d 184, 193-194; see generally *Estate of Reid* (1938) 26 Cal.App.2d 362, 367-370.)

The equitable conversion doctrine "'is a mere fiction resting upon the principle that equity regards things which are directed to be done as having actually been performed where nothing has intervened which ought to prevent such a performance.' [Citation.]" (*Parr-Richmond Industrial Corp. v. Boyd* (1954) 43 Cal.2d 157, 165-166.) The doctrine will not apply "where the contracting parties demonstrate an intention to the

19

contrary" (*id.* at p. 166), or "when 'it would compel an inequitable result . . . .'

[Citation]." (*Ocean Avenue LLC v. County of Los Angeles* (2014) 227 Cal.App.4th 344,

352.)

In *Alhambra Redevelopment Agency v. Transamerica Financial Services* (1989)

212 Cal.App.3d 1370 (*Alhambra Redevelopment*), this doctrine was applied to uphold an

award of condemnation proceeds to a purchaser of condemned property who had not yet

obtained title to the property.  As the Court of Appeal explained:  "[A] purchaser of real

property under a land sales contract is considered an equitable owner of the property and

is vested with the right to any condemnation award.  'An executory contract to convey

has the effect of vesting the equitable estate in the vendee, leaving in the vendor the

naked legal title.  As the equitable owner of the land, the vendee is entitled to any award

which may be made on condemnation of the property.'  [Citations.]  [¶]  In contrast, the

seller's rights in the property are extremely limited. . . .  [T]he seller only possesses legal

title to the property.  [Citation.]  The seller is considered to be nothing more than a

trustee, 'holding the land in trust for the purchaser as security for the payment of the

purchase price until a conveyance of the legal title to the vendee is finally made.'

[Citations.]" (*Id.* at pp. 1375-1376.)

In the case cited by the trial court in the present case—*Rogers, supra*, 28

Cal.App.4th 1215—the doctrine was applied to uphold the right of the

purchaser/equitable owner to receive the excess proceeds from a foreclosure sale of the

subject property.  (*Id.* at p. 1223.)  The court explained that, "as the equitable owners of

20

the property at the time of the foreclosure sale, plaintiffs would be entitled, in equity, to the sales proceeds under the doctrine of equitable conversion." (*Ibid*., fn. omitted.) By awarding the sale proceeds to the purchaser, the trial court "properly and fairly fashioned equitable relief 'to create substantially the same legal effects that the promised performance would have created' [citation], i.e., a judgment which gave [the purchaser] the benefit of the equity in the property, i.e., the sales proceeds . . . ." (*Id.* at p. 1224.)

The equitable conversion doctrine can, as a general matter, be applied in the present case in a straightforward manner. Under the settlement agreement, Touryalai was contractually obligated to deed his interest in the Hesperia properties to Mohammad. Mohammad was thus in the position of a purchaser of Touryalai's interests in the Hesperia properties and, consequently, the equitable owner of those interests. Although Touryalai continued to hold his legal interests in the parcels, he held such interests in trust for Mohammad as security for the purchase price—i.e., the performance of Mohammad's obligations under the agreement.

If the Hesperia parcels were condemned or foreclosed upon prior to Touryalai's transfer of his interest in the parcels, we could see no reason to distinguish this situation from that in the *Alhambra Redevelopment* or *Rogers* cases and would be compelled to conclude that Mohammad was entitled to the condemnation or excess foreclosure sale proceeds, subject to Mohammad's performance of his obligations. Indeed, it does not appear that Touryalai would disagree with this.

21

The problem, according to Touryalai, is that the sale of the three parcels did not come about by condemnation or foreclosure, but by Mohammad's choice to sell the parcels. *Rogers*, Touryalai asserts, is factually distinguishable and inapposite because the purchaser in *Rogers* "did not bring about the situation where performance of the contract became impossible. Here, by contrast, it was uncontroverted that Mohammad *chose* to sell the three properties to the City (with Touryalai receiving half the proceeds)." By doing so, Touryalai contends, Mohammad "intervened" and prevented Touryalai's performance of the contract. As such, Mohammad is precluded from invoking the equitable conversion doctrine. (See *Parr-Richmond Industrial Corp. v. Boyd, supra,* 43 Cal.2d at pp. 165-166 [equitable conversion applies "'where nothing has intervened which ought to prevent such a performance.'"].)

We see no reason why Mohammad's efforts to sell the Hesperia parcels should render the equitable conversion doctrine inapplicable and necessarily preclude him from obtaining the proceeds from that sale when both he and Touryalai agreed to the sale to the City. Under the equitable conversion doctrine, the equitable conversion occurs upon the entry into an agreement for the purchase of property. (See *Estate of Dwyer* (1911) 159 Cal. 664, 675; *Estate of Reid, supra,* 26 Cal.App.2d at p. 368.) Although its effect may not become apparent until a subsequent event, such as condemnation in *Alhambra Redevelopment* or the foreclosure sale in *Rogers*, the purchaser nevertheless acquires equitable title at the time the agreement is made. The seller, so long as he or she retains legal title, holds such title in trust for the purchaser as security for the purchase price.

22

(*Alhambra Development, supra,* 212 Cal.App.3d at p. 1376; *Orange Cove Water Co. v. Sampson* (1926) 78 Cal.App. 334, 342.) If, prior to the transfer of legal title, the purchaser/equitable owner desires to sell the purchased parcels and negotiates a price with a third party, and the seller/legal titleholder agrees to that sale, the proceeds from the sale would, in substance, take the place of the parcels. In that case, the parties should have the same status as to the proceeds that they had to the parcels prior to the third party sale. The equitable owner of the parcels would become the equitable owner of the sale proceeds; and the holder of the legal title to the parcels would hold the proceeds in trust for the benefit of the equitable owner. Thus, Touryalai, who held legal title to the parcels in trust for Mohammad as security for the performance of Mohammad's obligations under the agreement, would now hold the sale proceeds in trust for Mohammad for the same purpose; and Mohammad would have the equitable interest in the cash proceeds and be entitled to receive them outright upon the performance of his obligations.

Essential to this analysis is Touryalai's consent to the sale negotiated by Mohammad. If Touryalai, as one holding legal title as security for Mohammad's performance under the agreement, was concerned that the cash proceeds would provide inadequate security for Mohammad's performance, he could have refused to sell or insisted upon additional security as a condition of his approval. Mohammad's "intervention" in negotiating a sale did not, as Touryalai contends, prevent Touryalai's performance; Touryalai's performance became impossible only by his consent to the sale

23

to the City. Under these circumstances, Mohammad's efforts to sell the parcels did not prevent the application of the equitable conversion doctrine.

As noted above, the equitable conversion doctrine will not apply "when 'it would compel an inequitable result . . . .' [Citation]." (*Ocean Avenue LLC v. County of Los Angeles, supra,* 227 Cal.App.4th at p. 352.) The court's ruling did not produce an inequitable result; indeed, a contrary result would appear to be inequitable. The essence of the settlement agreement was that Mohammad would turn over his interest in properties located in Sun City and Hemet to Touryalai, Touryalai would turn over his interest in properties located in Hesperia and Victorville to Mohammad, and neither would compete against the other. Although the agreement appears to have been ignored in the three years after it was made, Mohammad has since delivered the Sun City and Hemet properties to Touryalai and has complied with the noncompetition provision; he has, in short, performed his part of the deal. Touryalai has delivered the Victorville property and one of the Hesperia properties to Mohammad, but never delivered his interest in the remaining Hesperia parcels; his performance remains deficient. Although the sale of the Hesperia parcels to the City has made his full performance to that extent impossible, fairness and equity compel the conclusion that the proceeds he received from that sale should be delivered to Mohammad. As the trial court recognized, "[a]ny other result would constitute a windfall to [Touryalai] and would frustrate the intent of the parties as reflected in their settlement agreement, now judgment."

24

3. Waiver

Touryalai next contends that Mohammad waived his right to Touryalai's proceeds from the sale. The trial court explicitly rejected this argument.

"'Waiver is the intentional relinquishment of a known right after knowledge of the facts.' [Citations.] The burden is on the party claiming waiver 'to prove it by clear and convincing evidence that does not leave the matter to speculation, and "doubtful cases will be decided against a waiver."' [Citations.] Waiver may occur by intentional relinquishment or by conduct so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." (*Harper v. Kaiser Cement Corp.* (1983) 144 Cal.App.3d 616, 619.)

Touryalai points to evidence that Mohammad arranged for the proceeds from the sale to the City to be paid in separate checks to Touryalai and himself rather than a single check payable to the parties jointly. We do not believe that this arrangement necessarily reflects Mohammad's waiver of his right to the proceeds. Mohammad was indisputably entitled to one-half of the proceeds from the sale to the City; his and Touryalai's rights to the other half was uncertain. Mohammad's desire for separate checks could have been motivated by a desire for an immediate payout of his undisputed one-half of the proceeds without having to wait until the rights to the remainder were determined. This possibility is suggested by Touryalai's testimony that he (Touryalai) wanted the proceeds "to go to the trust account, to be deposited in court or whatever." However, Mohammad "was very broke at the time" and told Touryalai that "he did need money" and "wanted to split the

25

checks." This indicates that Touryalai believed that disbursement of the proceeds should await a judicial determination, thus tying up the entire sum until the rights were adjudicated, while Mohammad desired immediate disbursement of the proceeds even if he would only receive one-half the total at that time. That Mohammad desired immediate and separate disbursement does not necessarily mean that he was relinquishing any claim he had to the amounts disbursed to Touryalai.

Mohammad also testified that while he agreed to provide for separate checks, he thought the "settlement agreement was still in effect." He believed that the payment did not affect the settlement agreement because he "could have made a different lawsuit and stop it, but [he] already had the lawsuit and [he] didn't want to go through another hell." Finally, on cross-examination he agreed with Touryalai's counsel that he allowed separate checks to be issued even though he understood that Touryalai "would gain possession of money that would otherwise come to [him] jointly" "because [he] didn't want any more headaches with this." These statements are equivocal and subject to different interpretations. They could support an inference, as Touryalai suggests, that Mohammad was relinquishing any claim to half the proceeds to avoid "any more headaches." But they could also support the view that Mohammad continued to believe that the agreement would control the rights to the proceeds and that he agreed to separate checks only because he was broke and needed some money immediately without the "headaches" of litigation.

26

Touryalai next asserts that Mohammad's act of moving to have judgment entered on the settlement agreement after the three Hesperia parcels had been sold evidences waiver. This argument assumes the conclusion that Mohammad had no right to the proceeds from the sale to the City under the settlement agreement. If he did not, Touryalai would be correct: Having judgment entered on an agreement that did not entitle Mohammad to the sale proceeds would be strong, if not conclusive, evidence of waiver. However, as established in the preceding part, Mohammad was entitled to the proceeds under the agreement (or, at least, the trial court could reasonably conclude he had that right) with the aid of the equitable conversion doctrine. Because Mohammad was entitled to the proceeds under the settlement agreement, his effort to have that agreement enforced as a judgment cannot constitute a waiver of his claim to the proceeds.

Touryalai also points to the following colloquy between his counsel and the trial court at the hearing to have judgment entered on the settlement agreement:

"[Counsel for Touryalai:] . . . I'm also concerned that when the Court is speaking of this at this time, it[']s speaking of a transaction that was done in August, 2006, and whatever the events are after that, that might affect the rights and liabilities of the parties are issues that are not before the Court, quite frankly.

"[Court]: That's right, and I'm not a referee, and you might be interested in my thoughts on what you ought to do, but those and 50 cents might not even buy you a cup of coffee anymore."

Touryalai asserts that the court's comment "amounted to an advisement that by asking for judgment to be entered, Mohammad was locking into the state of affairs as of August 2006, without factoring in the sale that had happened subsequently."  Touryalai adds that Mohammad's counsel did not respond to this colloquy indicating that Mohammad "was content to have the 2006 settlement converted to a judgment *as it stood* – with no 'ifs' or 'buts.'"

We see nothing in the cited colloquy between the court and Touryalai's counsel or in Mohammad's counsel's apparent lack of interest in that colloquy that suggests that Mohammad was waiving his right to assert his claim to the sale proceeds.

In conclusion, although there is evidence in the record from which inferences can be drawn to support a waiver argument, we cannot conclude that the trial court erred in finding that Touryalai failed to satisfy his burden of proving waiver.

4.  Judicial Estoppel

Touryalai next contends that Mohammad is judicially estopped from asserting his claim for the sale proceeds.  Although the trial court did not expressly address this argument, it was raised below and implicitly rejected.  Because we find no abuse of discretion in rejecting the argument, there was no error.

""""'Judicial estoppel precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position. [Citations.] *The doctrine's dual goals are to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies.*  [Citation.]  . . .'"  [Citation.]

28

The doctrine applies when "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." [Citations.]' [Citations.]" (*People v. Castillo* (2010) 49 Cal.4th 145, 155.) "[J]udicial estoppel *is an equitable doctrine*, and its application, even where all necessary elements are present, is discretionary." (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422.)

Touryalai argues that Mohammad's two positions are: (1) that the settlement agreement represents a full, final, and complete agreement between the parties; and (2) he is asking for a form of relief not contained in the settlement agreement or judgment, i.e., a cash payment. Touryalai contends these two positions are inconsistent because the "final and complete" settlement agreement "provides for one thing," but Mohammad later argued that he is "actually entitled to something different."

The two positions are not necessarily inconsistent. Mohammad's assertion that the settlement agreement is a full, final, and complete agreement was made in the context of the motion to enforce the settlement and have judgment entered thereon. He insists that he has never asserted otherwise. According to Mohammad, by seeking the proceeds Touryalai received from the sale, "he is simply seeking to enforce the full and final settlement . . . ." There is logic to Mohammad's position: The full, final, and complete

29

agreement calls for Touryalai to transfer his interest in the Hesperia parcels to Mohammad; if Touryalai never sold his interest in the Hesperia parcels, a motion to enforce the agreement by compelling Touryalai to deliver title to the Hesperia properties would have been consistent with the assertion that the agreement is a full, final, and complete agreement; however, Touryalai sold three of the Hesperia parcels for cash; under the doctrine of equitable conversion, Mohammad has the same right to that cash that he did to the parcels; it follows that a motion to compel Touryalai to deliver that cash is just as consistent with the assertion of a full, final, and complete settlement agreement as a motion to compel Touryalai to deliver title to the Hesperia properties would have been.

Because the trial court could reasonably conclude that the assertion of the agreement as full, final, and complete was not inconsistent with Mohammad's effort to enforce the agreement by seeking to recover Touryalai's proceeds, the court did not abuse its discretion in rejecting the judicial estoppel argument.

C. *Effect of Purchase and Sale Agreement*

The purchase and sale agreement with the City regarding the three Hesperia parcels includes this "merger" provision: "This Agreement and other documents incorporated herein by reference contain the entire understanding between the parties relating to the transaction contemplated hereby and all prior to [*sic*] contemporaneous agreements, understandings, representations and statements, oral or written, are merged herein and shall be of no further force or effect." Touryalai quoted this provision, among

30

numerous other provisions of the purchase agreement, in the statement of facts in his opposition to the motion to enforce the judgment. He did not, however, make any argument based on the provision.

On appeal, Touryalai contends that the merger provision constitutes an express acknowledgment by Mohammad "that the 2006 agreement would be of 'no further force or effect,'" and that it "amounted to a voluntary, *contractual* – as opposed to equitable – abandonment of whatever rights regarding the three properties Mohammad would otherwise have had." We decline to consider this argument because it was not asserted below. (See *Perez v. Grajales* (2008) 169 Cal.App.4th 580, 591-592 [arguments raised for the first time on appeal are generally deemed forfeited].) Although we may consider new arguments that present pure questions of law (*In re Spencer S.* (2009) 176 Cal.App.4th 1315, 1323), Touryalai's argument raises factual issues as to whether the parties' intended the provision to cancel the 2006 settlement agreement. Because neither Mohammad nor the trial court had the opportunity to address this argument and the factual issues it raises, it would be unfair to both to decide the appeal on that basis. (See *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184-185, fn. 1; *Zimmerman, Rosenfeld, Gersh & Leeds LLP v. Larson* (2005) 131 Cal.App.4th 1466, 1488.)

Even if the argument has not been forfeited, it is not persuasive. The merger clause does not, as Tourylai asserts, expressly acknowledge that the 2006 settlement agreement will have no further force or effect; indeed, it makes no mention whatsoever of

31

that agreement. Instead, it refers only vaguely to the understanding of the parties "relating to the transaction contemplated hereby." The contemplated transaction is the sale of the three Hesperia parcels to the City, not the exchange of properties between Touryalai and Mohammad called for in the 2006 agreement. Moreover, if Touryalai and Mohammad intended to cancel or novate their 2006 agreement, it is unlikely they would have used what appears to be a boilerplate merger clause within the "MISCELLANEOUS" provisions of the City's purchase and sale contract without making any specific reference to the prior agreement. Reading the merger provision in light of the entire purchase and sale contract, we do not believe the parties intended that it render the 2006 agreement ineffective and unenforceable.

## IV.  DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING _____
J.

We concur:

RAMIREZ _____
P. J.

MILLER _____
J.

32